**2018 UT App 46**

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
MEAGAN GRUNWALD,
Appellant.

Opinion
No. 20160079-CA
Filed March 22, 2018

Fourth District Court, Provo Department
The Honorable Darold J. McDade
No. 141400517

Margaret P. Lindsay and Douglas J. Thompson,
Attorneys for Appellant

Sean D. Reyes and Christopher D. Ballard, Attorneys
for Appellee

JUDGE DIANA HAGEN authored this Opinion, in which JUDGES
GREGORY K. ORME and KATE A. TOOMEY concurred.

HAGEN, Judge:

¶1     This appeal arises from a crime spree that left one police officer dead and another gravely injured. The deadly rampage ended when Jose Angel Garcia Juaregi (Garcia) was shot and killed by police. His teenaged girlfriend, Meagan Grunwald, was charged and convicted as an accomplice to the aggravated murder of Sergeant Cory Wride[1] (Count One); the attempted

---

1. "This court typically does not include the names of crime victims, witnesses, or other innocent parties in its decisions. We make an exception in this case due to the considerable notoriety this criminal episode has attracted. The . . . identity [of the

(continued…)

aggravated murder of Deputy Greg Sherwood and felony discharge of a firearm resulting in serious bodily injury (Counts Two and Three); felony discharge of a firearm for shooting at Trooper Jeff Blankenagel (Count Five); felony discharge of a firearm and criminal mischief for shooting and damaging a semi-trailer truck (Counts Six and Seven); and aggravated robbery for carjacking a vehicle from another motorist (Count Eleven).[2]

¶2    At trial, the jury was incorrectly instructed on the elements of accomplice liability. After carefully reviewing the evidence presented at trial, we hold that the error was harmless with respect to Counts One and Eleven and therefore affirm those convictions. With respect to Counts Two, Three, Five, Six, and Seven, however, there is a reasonable probability that the result would have been different if the jury had been correctly instructed on the law. As a result, we must vacate those convictions and remand for a new trial on those counts.

---

(…continued)
officers involved in this case] is well known, and obscuring [their] identit[ies] in this decision would serve no purpose." *State v. Chavez-Reyes*, 2015 UT App 202, ¶ 2 n.2, 357 P.3d 1012.

2. On appeal, Grunwald does not challenge her convictions for fleeing an accident scene (Count Nine), failure to respond to an officer's signal to stop (Count Ten), and possession of a controlled substance (Count Twelve), in which she was charged as a principal. She was additionally charged as an accomplice to attempted aggravated murder for the shots fired at Trooper Blankenagel (Count Four), but she was acquitted of that charge.

BACKGROUND

¶3     In June 2013, when Grunwald was sixteen years old, she was introduced to Garcia by a mutual friend. Garcia had been previously convicted of manslaughter and was on parole. Although Garcia was almost ten years older than Grunwald, they became romantically involved. By September, Garcia had moved into the Grunwald family home in Draper, Utah. Garcia's presence in the home and his intimate relationship with Grunwald resulted in friction between Grunwald's parents.

¶4     In January 2014, Grunwald's parents decided to separate, and Grunwald planned to move with her mother to St. George, Utah. Garcia told his parole officer that he wanted to transfer his supervision to St. George so that he could stay with Grunwald. His parole officer directed Garcia to stay with his brother in Provo, Utah and to report in on January 27. When Garcia failed to report, the parole officer applied for an arrest warrant.

¶5     On January 30, Grunwald and her mother were packing their belongings when Garcia asked Grunwald to "go on a ride" with him so they could talk. Grunwald agreed, and she and Garcia drove away in her truck, with Grunwald behind the wheel.

¶6     At some point during the drive, Garcia told Grunwald that there was a warrant out for his arrest. The circumstances surrounding this announcement were disputed at trial, but Grunwald became sufficiently upset to pull off to the side of Highway 73 and turn on her hazard lights.

¶7     Sergeant Cory Wride, with the Utah County Sheriff's Office, noticed the truck on the side of the road and notified dispatch that he was conducting a "motorist assist." He approached the driver's window and asked Grunwald if she was okay. Although she was crying and her face was red, Grunwald told him she was fine. He asked for her identification and car

registration and then went back to his vehicle to confirm her information with a police dispatcher. When Sergeant Wride returned to the truck, he gave the documents back to Grunwald and asked her again if she was sure she was okay. When she assured him that she was, he turned his attention to Garcia. Garcia provided a false name and birthdate, and Sergeant Wride again returned to his vehicle to verify the information.

¶8    According to Grunwald, Garcia told her to put her foot on the brake while he shifted the truck into drive.[3] With a gun in hand, Garcia announced to Grunwald that he was "going to buck [the officer] in the fucking head." Grunwald held her foot on the brake with the car in drive for more than three-and-a-half minutes. During this time, a passing motorist noticed that Grunwald was checking her driver's side mirror. When there was a significant lull in traffic, Garcia slid open the truck's back window and fired seven shots at Sergeant Wride as he sat in is patrol vehicle. Immediately after Garcia fired the shots, Grunwald accelerated back onto the road and drove away.

¶9    Two bullets struck Sergeant Wride, one piercing his forehead and the other puncturing his neck. When Sergeant Wride did not answer his radio or calls to his mobile phone, another officer drove to his last known location. The officer found Sergeant Wride dead. He notified the dispatch center, and other officers began searching for Grunwald's truck.

¶10    About an hour and a half after the shooting, police first spotted the truck travelling southbound on I-15 between the two Santaquin exits. When police gave chase, Grunwald pulled into

---

3. While Grunwald testified that Garcia shifted the truck into drive, the State's theory at trial was that Grunwald herself shifted the truck into drive in preparation for the subsequent shooting. Our analysis does not turn on whether the jury believed that Garcia or Grunwald operated the gearshift.

an emergency turnaround and made a U-turn to head northbound on I-15.

¶11 Another officer, Utah County Sheriff's Deputy Greg Sherwood, spotted Grunwald's truck as she exited the interstate at the Santaquin Main Street exit and began to follow. When Deputy Sherwood activated his siren and overhead lights, Grunwald suddenly reduced her speed, which closed the gap between the two vehicles. In that instant, Garcia fired at Deputy Sherwood through the truck's back window. One bullet struck Deputy Sherwood in the head, causing serious injury. Fortunately, Deputy Sherwood survived the shooting.

¶12 Immediately after Garcia fired at Deputy Sherwood, Grunwald made another abrupt U-turn and headed back to the I-15 on-ramp. Utah Highway Patrol Trooper Jeff Blankenagel spotted Grunwald's truck once it was back on the interstate. As Trooper Blankenagel followed the truck, Garcia fired two shots in his direction from the truck's back window. Trooper Blankenagel reduced his speed to create a safe following distance between his vehicle and Grunwald's truck. Ahead on I-15, other officers had deployed a spike strip to stop the truck. Grunwald maneuvered around it, but the spike strip disabled Trooper Blankenagel's vehicle. As Grunwald continued driving, she crashed into another vehicle, resulting in damage to the front end of the truck that impaired her ability to steer and brake.

¶13 Undeterred, Grunwald continued driving and passed a semi-trailer truck traveling southbound on I-15. As they went by, the truck driver saw Garcia lean out of the truck's passenger window and fire shots at his semi-trailer. The truck driver pulled over to examine his vehicle and found that the gun shots had damaged parts of the truck.

¶14 Shortly after passing the semi-trailer truck, Grunwald took the Nephi Main Street exit off of I-15, and she and Garcia abandoned the disabled truck. Garcia ran down the middle of

the road away from the truck, and Grunwald followed. Officers yelled at them to "stop" and "[g]et down." Ignoring these commands, Garcia fired at an officer while Grunwald ran directly toward a moving car waving her arms. The driver saw Grunwald flagging her down and stopped her vehicle. While Grunwald opened the passenger side door and climbed in, Garcia opened the driver's door, waved his gun at the driver, and ordered her to get out. The driver asked if she could get her daughter out of the back seat, to which Garcia replied, "[Y]ou better hurry." As soon as the driver retrieved her daughter, Garcia drove away with Grunwald in the passenger seat.

¶15    Garcia returned to I-15, but police successfully deployed tire spikes, slowing the vehicle and eventually causing a tire to become dislodged. When the disabled vehicle came to a stop, Garcia abandoned it, running toward another vehicle with Grunwald following him. Officers yelled at them to stop and get down. As Garcia neared the other vehicle, gunfire erupted. Grunwald stopped and dropped to her knees.

¶16    Garcia continued to flee and aimed his gun at an approaching officer. The officer yelled, "Show me your hands." When Garcia failed to do so, the officer fired two shots. Grunwald saw one bullet strike Garcia in the head, and she began to scream. The officer who fired heard her yell, "You shot him in the fucking head." A bystander saw Grunwald pacing frantically, acting distraught and hysterical. She appeared angry at the police and screamed, "You fucking ass holes, you didn't have to shoot him. You fucking shot him. Oh, my God, you fucking shot him."

¶17    Garcia, on the ground but still conscious, continued to struggle as officers wrestled away his gun and placed him in handcuffs. Once he was subdued, officers attempted to administer first aid. Garcia asked them for water then said, "Why don't you let me kiss my girlfriend with my last dying breath?" Garcia died later that day.

¶18    After Grunwald was arrested and placed in a patrol vehicle, she claimed that Garcia had threatened to shoot her and her family if she refused to go with him and that she "tried to get him to stop."

¶19    The State charged Grunwald with twelve counts associated with these events. On Counts One through Seven and Count Eleven, the State charged Grunwald as an accomplice. She pled not guilty to all charges and the case proceeded to trial. Between April 28 and May 9, 2015, the district court held a nine-day trial, during which Grunwald raised the affirmative defense of compulsion. At the end of trial, the jury convicted Grunwald of eleven of the twelve counts, acquitting her of Count Four, attempted aggravated murder for Garcia's shooting at Trooper Blankenagel.

¶20    On July 8, 2015, the court sentenced Grunwald to various prison terms of zero-to-five years to twenty-five years to life. The court imposed a sentence of twenty-five years to life on Count One (aggravated murder) to run consecutively with a sentence of five years to life on Count Eleven (aggravated robbery). The court ordered the sentences on the remaining counts to run concurrently with all other counts.

¶21    Grunwald appealed. Pursuant to Utah Code section 78A-3-102(4), the Utah Supreme Court transferred the appeal to this court. Utah Code Ann. § 78A-3-102(4) (LexisNexis 2017).


ISSUE AND STANDARD OF REVIEW

¶22    Grunwald contends that she received ineffective assistance of counsel because her attorney failed to object to erroneous jury instructions on accomplice liability. "When a claim of ineffective assistance of counsel is raised for the first time on appeal, there is no lower court ruling to review and we must decide whether [the] defendant was deprived of the

effective assistance of counsel as a matter of law." *Layton City v. Carr*, 2014 UT App 227, ¶ 6, 336 P.3d 587 (alteration in original).

ANALYSIS

¶23 An accused is guaranteed assistance of counsel for his or her defense under the Sixth Amendment to the United States Constitution and article 1, section 12 of the Utah Constitution. "[T]he right to counsel is the right to the effective assistance of counsel." *Strickland v. Washington*, 466 U.S. 668, 686 (1984) (citation and internal quotation marks omitted). To establish a constitutional claim of ineffective assistance of counsel, a defendant must demonstrate both "that counsel's performance was deficient" and "that the deficient performance prejudiced the defense." *Id.* at 687; *see also State v. Litherland*, 2000 UT 76, ¶ 19, 12 P.3d 92 (following *Strickland*'s two-prong test for ineffective assistance of counsel). To satisfy the first element, a defendant must show that "counsel's representation fell below an objective standard of reasonableness," which "overcome[s] the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland*, 466 U.S. at 688–89 (citation and internal quotation marks omitted). The second element requires that the defendant establish that "a reasonable probability exists that, but for counsel's error, the result would have been different." *State v. Millard*, 2010 UT App 355, ¶ 18, 246 P.3d 151 (citation and internal quotation marks omitted).

¶24 In this case, counsel's performance was deficient because counsel failed to object to serious errors in the jury instructions relating to accomplice liability. As to prejudice, we conclude that there is a reasonable probability that the result would have been different on some counts but not others.

## I. Deficient Performance

¶25 To assess deficient performance in this case, we must evaluate whether the instructions provided to the jury correctly stated the law. Because the jury instructions at issue concerned accomplice liability, we begin with a review of Utah law on that subject.

¶26 Under section 76-2-202 of the Utah Code, "[e]very person, acting with the mental state required for the commission of an offense who directly commits the offense, who solicits, requests, commands, encourages, or intentionally aids another person to engage in conduct which constitutes an offense shall be criminally liable as a party for such conduct." Utah Code Ann. § 76-2-202 (LexisNexis 2017). Under this statute, "accomplice liability adheres only when the accused acts with the mens rea to commit the principal offense." *State v. Calliham*, 2002 UT 86, ¶ 64, 55 P.3d 573. To prove the requisite mens rea,[4] "the State must show that an individual acted with both the intent that the underlying offense be committed and the intent to aid the principal actor in the offense." *State v. Briggs*, 2008 UT 75, ¶ 13, 197 P.3d 628.

¶27 "[T]he first step in applying accomplice liability is to determine whether the individual charged as an accomplice had the intent that an underlying offense be committed." *Id.* ¶ 14. In this context, "intent" means "[t]he state of mind accompanying an act," and it is not to be confused with the mental state "intentionally." *State v. Jeffs*, 2010 UT 49, ¶ 43, 243 P.3d 1250 (alteration in original) (citations and internal quotation marks omitted). Regardless of the mental state required, the accomplice

---

4. "Mens rea" means "[t]he state of mind that the prosecution, to secure a conviction, must prove that a defendant had when committing a crime." *Mens Rea*, Black's Law Dictionary (10th ed. 2014).

must possess that mental state with respect to the commission of the principal crime. *See id.* ¶ 44. Second, under the "intentionally aids" portion of accomplice liability, the "accomplice must intentionally aid in the commission of a crime to be held criminally liable." *Briggs*, 2008 UT 75, ¶¶ 13, 15. In other words, the accomplice must intentionally provide aid directed to accomplishing the crime. *See Jeffs*, 2010 UT 49, ¶ 44.

¶28 The Utah Supreme Court's decision in *Jeffs*, illustrates these principles. Jeffs was charged as an accomplice to rape for his role in performing a coerced marriage between the principal and an underage girl. *See id.* ¶¶ 4–13. At trial, Jeffs unsuccessfully requested a jury instruction requiring the State to prove that he "intended that the result of his conduct would be that [the principal] rape [the victim]." *Id.* ¶ 40. The Utah Supreme Court held that he was entitled to this instruction for two reasons.

¶29 First, the provided instructions failed to connect the required mental state to the commission of the principal crime. Because the principal offense of rape could be committed "intentionally, knowingly or recklessly," the State had to prove that Jeffs acted "intentionally, knowingly, or recklessly" to convict him as an accomplice. *Id.* ¶ 44 "But," the court asked rhetorically, "intentionally, knowingly, or recklessly in regard to what?" *Id.* The instruction provided to the jury "only indicated that the reckless, knowing, or intentional mental state attached to the actions of 'solicited, requested, commanded, or encouraged,' not to the underlying criminal conduct of rape." *Id.* ¶ 42. This was error. The *Jeffs* court explained that in order for an accomplice to act "with the mental state required for the commission of [the] offense," the accomplice "must act intentionally, knowingly, or recklessly as to the results of his conduct. And in order for criminal liability to attach, the results of his conduct must be a criminal offense." *Id.* ¶ 44 (alteration in original) (citation and internal quotation marks omitted). An accomplice to rape would act intentionally if he "desires to cause

rape," knowingly if he "knows that his conduct will most likely cause rape," and recklessly if he "recognizes that his conduct could result in rape but chooses to proceed anyway." *Id.* ¶ 45.

¶30 Second, the jury instructions in *Jeffs* failed to clarify the "intentionally aided" portion of the accomplice liability statute. Where "the defendant is charged with aiding another in the commission of the offense, the accomplice liability statute requires that the defendant's aiding be 'intentional,'" meaning that the accomplice must intend to aid the principal in committing the offense. *Id.* ¶¶ 50–51 (quoting Utah Code Ann. § 76-2-202 (2008)). "Without Jeffs' proposed instruction as to intent, the jury could have convicted Jeffs if it found that Jeffs 'intentionally' did some act, and such intentional act *unintentionally* 'aided'" the principal in raping the victim. *Id.* ¶ 52. As a result, the jury could have convicted Jeffs as an accomplice "simply because he intentionally performed the marriage ceremony and the existence of the marriage aided [the principal] in raping [the victim]." *Id.* In short, the instructions failed to require the State to prove that Jeffs "acted with both the intent that the underlying offense be committed and the intent to aid the principal actor in the offense." *Id.* ¶ 51 (citation and internal quotation marks omitted).

¶31 With these principles in mind, we turn to the accomplice liability instructions in this case. Instructions 33, 38, 40, 44, 45, 46, and 50 each contain identical language, replacing only the name and elements of the principal crime. In relevant part, these instructions required the jury to find:

> 1. That the defendant, Meagan Dakota Grunwald,
> 2. "Intentionally," "knowingly," or "recklessly" solicited, requested, commanded, encouraged, <u>or</u> "intentionally" aided [Garcia] who:
>     [elements of principal crime]
> 3. And that the defendant, Meagan Dakota Grunwald,

> a. Intended that [Garcia] commit the [principal crime], or
> b. Was aware that [Garcia's] conduct was reasonably certain to result in [Garcia] committing the [principal crime], or
> c. Recognized that her conduct could result in [Garcia] committing the [principal crime] but chose to act anyway;
> 4. And that the defense of Compulsion does not apply.

This instruction appears to be based on the Utah Model Jury Instruction on accomplice liability, which reverses the order in which the elements appear in the statute. The first statutory element—"acting with the mental state required for the principal offense"—is addressed in paragraph 3 of the instruction. The second element—"solicits, requests, commands, encourages, or intentionally aids another person to engage" in the principal offense—is addressed in paragraph 2.

¶32 Grunwald has identified three distinct errors in this jury instruction, which we address in the following order. First, by including paragraph 3(c), the instruction incorrectly permitted the jury to convict if it found that Grunwald acted recklessly, when each of the underlying offenses—unlike the offenses in *Jeffs*—require either an intentional or knowing mental state. Second, instead of tracking the statutory language that requires an accomplice to solicit, request, command, encourage, or intentionally aid another *to* commit a crime, paragraph 2 mistakenly replaced "to" with "who," effectively eliminating the requirement that the accomplice's conduct be directed to the accomplishment of the crime. Third, in defining the "knowing" mental state in paragraph 3(b), the instruction focuses on Garcia's conduct rather than Grunwald's. We agree with Grunwald that the instruction misstated the law on accomplice liability in all three respects.

A.      The Accomplice Must Have the Mental State Required for
        the Commission of the Principal Offense.

¶33     The most obvious error in the accomplice liability
instruction is that it permits a conviction based on a reckless
mental state. Accomplice liability requires that the defendant act
"with the mental state required for the commission of [the
principal] offense." Utah Code Ann. § 76-2-202 (LexisNexis
2017). It is unnecessary for the accomplice to act "with the same
intent, or mental state, as the principal." *State v. Jeffs*, 2010 UT 49,
¶ 49, 243 P.3d 1250. But an accomplice cannot be convicted based
on a lesser mental state than that required to commit the
underlying offense. *See State v. Calliham*, 2002 UT 86, ¶ 64, 55
P.3d 573 (noting that "accomplice liability adheres only when the
accused acts with the mens rea to commit the principal offense").

¶34     This statutory element was addressed in paragraph 3 of
the accomplice liability instruction. Paragraph 3 allowed the
State to prove one of three alternative mental states.[5] Paragraph

---

5. The inclusion of recklessness in paragraph 3 is not to be
confused with the use of the term "recklessly" in paragraph 2.
Paragraph 3 deals with the element that the accomplice must
have the mental state required to commit the principal offense.
On the other hand, paragraph 2 deals with the separate element
that the accomplice must solicit, request, command, encourage,
or intentionally aid the principal. As Grunwald acknowledges,
"Because the statute does not designate what mental state is
required for these acts [of soliciting, requesting, commanding, or
encouraging] and because it is not a strict liability statute, any of
the three recognized mental states apply." *See* Utah Code § 76-2-
101 (LexisNexis 2017). As a result, paragraph 2 correctly
required the jury to find that Grunwald "'[i]ntentionally,'
'knowingly,' or 'recklessly' solicited, requested, commanded,
encouraged, or 'intentionally' aided" Garcia. The error was the
inclusion of paragraph 3(c), which allowed the jury to convict

(continued…)

3(a) and 3(b), respectively, instructed the jury that a finding of an intentional or knowing mental state would support a guilty verdict. Paragraph 3(c) allowed the jury to convict if Grunwald acted recklessly, that is, if Grunwald recognized that her conduct could result in Garcia committing the underlying crime but chose to act anyway.

¶35    In this case, none of the underlying crimes charged could be committed recklessly. *See* Utah Code Ann. § 76-5-202 (aggravated murder requires intentionally or knowingly causing death); *id.* § 76-10-508.1(1) (felony discharge of a firearm requires knowingly endangering a person or intent to intimidate or harass); *id.* § 76-6-106(2)(c) (criminal mischief requires intentional property damage); *id.* §§ 76-6-301–302 (aggravated robbery requires intentional taking by means of force or fear or intentionally or knowingly using force or fear during theft). As a result, the State properly concedes that "including the reckless mental state was erroneous because, as [Grunwald] correctly argues, all of the accomplice liability crimes required the jury to find either an intentional or knowing mental state."

¶36    It was error to instruct the jury in paragraph 3(c) that it could convict Grunwald as an accomplice if she "[r]ecognized that her conduct could result in [Garcia] committing the [principal crime] but chose to act anyway." Instead, Grunwald could not be held liable as an accomplice unless she either intended or knew that her conduct—i.e., intentionally, knowingly, or recklessly soliciting, requesting, commanding encouraging or intentionally aiding Garcia—would result in the commission of the principal crime. By allowing the jury to convict if it found Grunwald acted recklessly as to the results of

_____

(…continued)
Grunwald if she "[r]ecognized that her conduct could result in [Garcia] committing the [principal crime] but chose to act anyway."

her conduct, the instructions impermissibly reduced the State's burden with respect to the mental state element.

B.    The Accomplice's Conduct Must Be Directed at Committing the Principal Offense.

¶37    The second error Grunwald identified relates to the requirement that an accomplice's conduct must be directed toward accomplishing the principal offense. Paragraph 2 of the accomplice liability instructions allowed the jury to find Grunwald guilty if she "intentionally, knowingly, or recklessly solicited, requested, commanded or intentionally aided [Garcia] *who*" committed the principal crime. The State concedes that the instruction misstates the statutory language, which imposes accomplice liability on one "who solicits, requests, commands, encourages, or intentionally aids another person *to* engage in conduct which constitutes an offense." Utah Code Ann. § 76-2-202 (LexisNexis 2017) (emphasis added). However, the State argues that the substitution of the word "who" for the word "to" does not render the jury instructions erroneous when read as a whole.

¶38    While the substitution of a single word might seem insignificant and might be so in other contexts, substituting "who" for "to" fundamentally changed what the State was required to prove to convict Grunwald as an accomplice. As explained in *Jeffs*, an accomplice must act with the requisite mental state "as to the results of his conduct" and "the results of his conduct must be a criminal offense." *State v. Jeffs*, 2010 UT 49, ¶ 44, 243 P.3d 1250. In other words, an accomplice's conduct must be directed at accomplishing the principal crime. Here, to convict Grunwald as an accomplice, she had to either intend for her conduct to result in Garcia's commission of the underlying crimes or know that her conduct was reasonably certain to cause that result. *See* Utah Code Ann. § 76-2-103(1)–(2) (defining "intentionally" and "knowingly" mens rea).

¶39 To adequately convey this requirement to the jury, the instruction should have required the State to prove that Grunwald solicited, requested, commanded, encouraged, or aided Garcia *to* commit the crime. By substituting the word "who," the instruction permitted the jury to find Grunwald guilty if she solicited, requested, commanded, encouraged, or aided Garcia in any way, so long as Garcia committed the principal crimes. The instructions thus failed to convey the statutory requirement that an accomplice must have the requisite mens rea to commit the principal offense.[6]

C.     The Accomplice's Mental State Must Relate to the Results of the Accomplice's Conduct.

¶40 The third error identified by Grunwald relates to the requirement that an accomplice act with the requisite mental state as to the results of her own conduct. Paragraph 3(b) of the jury instruction, which addresses the "knowing" mental state, allowed the jury to convict her as an accomplice if she "[w]as aware that the principal actor's . . . conduct was reasonably

6. The State argues that the accomplice liability instructions remedied any ambiguity created by the "who"/"to" error in paragraph 2 because paragraph 3 required the jury to find that Grunwald either intended that Garcia commit the charged crimes, knew that he would do so, or was reckless as to whether he would do so. The State contends that, when read as a whole, the instruction required the jury not only to find that Grunwald aided Garcia but to find that she intended, through her aid, to assist him in committing the crimes. However, as explained in this opinion, paragraph 3(b) incorrectly focused on the results of Garcia's actions, rather than the results of Grunwald's actions, and paragraph 3(c) erroneously allowed the jury to convict based on recklessness. Given these additional errors, we cannot say that the jury instructions, when read as a whole, adequately stated the law.

certain to result in the principal actor . . . committing the [underlying crime]." Grunwald contends that "the instructions defined the knowing mental state with regard to Garcia's conduct, not her own." We agree.

¶41    A person acts "knowingly" if "he is aware that his conduct is reasonably certain to cause the result." Utah Code Ann. § 76-2-103(2) (LexisNexis 2017). Thus, an accomplice acts knowingly if "the accomplice knows that his conduct will most likely cause" the principal crime. *State v. Jeffs*, 2010 UT 49, ¶ 45, 243 P.3d 1250. The accomplice liability instructions misstated the law by permitting a conviction if Grunwald knew that Garcia's conduct—rather than her own—was reasonably certain to result in the commission of the principal crimes. The jury should have been instructed to find Grunwald not guilty unless the State proved that she acted intentionally or knowingly as to the results of her own conduct in accomplishing the principal crime.

¶42    Through this combination of errors, the jury instructions improperly allowed the jury to convict Grunwald as an accomplice under three impermissible scenarios: (1) if she acted recklessly as to the results of her conduct, rather than intentionally or knowingly; (2) if she directed her actions to some purpose other than the commission of the principal crime; or (3) if she acted knowing that Garcia's actions, rather than her own, were reasonably certain to result in the commission of the principal crime. These errors had the effect of reducing the State's burden of proof at trial. While we recognize that Grunwald's primary defense was compulsion, no reasonable trial strategy would justify trial counsel's failure to object to instructions misstating the elements of accomplice liability in a way that reduced the State's burden of proof. *See State v. Barela*, 2015 UT 22, ¶ 27, 349 P.3d 676 (holding that "no reasonable lawyer would have found an advantage in understating the mens rea requirement" regardless of whether the error related to the defense theory). As a result, trial counsel was deficient for

failing to object to the instructions on Counts One through Seven and Count Eleven.

## II. Prejudice

¶43 Deficient performance does not require reversal unless the defendant establishes that "a reasonable probability exists that, but for counsel's error, the result would have been different." *State v. Millard*, 2010 UT App 355, ¶ 18, 246 P.3d 151 (citation and internal quotation marks omitted). Grunwald contends that "if the jury had been properly instructed on the law of accomplice liability and the mental states required to prove [that she] acted as an accomplice, . . . there is a reasonable probability the jury would have had a reasonable doubt." The State asserts that the errors in this case were not prejudicial because (1) "none of the errors [Grunwald] identifies affected her primary defense—compulsion," and (2) "the objective evidence overwhelmingly demonstrated that [Grunwald] and [Garcia] worked in concert and that she was his loyal teammate."

¶44 To be clear, the burden is on the defendant to affirmatively prove prejudice. *See State v. Garcia*, 2017 UT 53, ¶ 36. "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Strickland v. Washington*, 466 U.S. 668, 693 (1984). Instead, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* This is "a relatively high hurdle to overcome." *Garcia*, 2017 UT 53, ¶ 44.

¶45 To determine whether a defendant has met this burden, a reviewing court "needs to focus on the evidence before the jury and whether the jury could reasonably have found" the facts in the defendant's favor "such that a failure to instruct the jury properly undermines confidence in the verdict." *Id.* ¶ 42. Here,

because there were three errors in the jury instructions, we must assess whether there is a reasonable probability that the jury convicted due to any one of those errors and otherwise "would have had a reasonable doubt respecting guilt." *Strickland*, 466 U.S. at 695.

¶46    In assessing each conviction, we assume that the jury found beyond a reasonable doubt both that Garcia committed the principal crimes and that Grunwald "intentionally, knowingly, or recklessly solicited, requested, commanded, encouraged, or intentionally aided" Garcia. Grunwald does not challenge these aspects of the accomplice jury instructions or the sufficiency of the evidence to support these findings. We refer to the act of soliciting, requesting, commanding, encouraging, or intentionally aiding Garcia as Grunwald's "conduct," or as "intentionally aiding" because that variant is most applicable to the facts of this case. With those assumptions in mind, we ask the following questions to determine whether Grunwald suffered prejudice based on any one of the three errors in the jury instructions:

- Is there a reasonable probability that the jury found Grunwald acted recklessly, rather than knowingly or intentionally, as to whether her conduct would result in the commission of the principal crime?

- Is there a reasonable probability that the jury found that Grunwald's conduct was not directed to Garcia's commission of the crime?

- Is there a reasonable probability that the jury found that Grunwald knew that Garcia's conduct, but not necessarily her own, was reasonably certain to result in the crime?

¶47    We first address those convictions where there is no reasonable probability that the erroneous jury instructions

affected the outcome of the trial. We then turn to those convictions where there is a reasonable probability that the jury might well have acquitted Grunwald if it had been properly instructed.

A.    Grunwald Has Not Established Prejudice with Respect to Counts One and Eleven.

¶48    Based on our review of the evidence presented at trial, we conclude there is no reasonable probability that the jury would have acquitted Grunwald on Counts One and Eleven but for the erroneous instructions on accomplice liability.

1.    Aggravated Murder of Sergeant Wride (Count One)

¶49    Count One charged Grunwald as an accomplice to the crime of aggravated murder arising from the shooting death of Sergeant Wride. To convict Grunwald of this charge, the State had to prove that Grunwald either intended that her conduct would result in Garcia committing the crime of aggravated murder or that she was aware that her conduct was reasonably certain to result in Garcia committing that crime. *See* Utah Code Ann. § 76-2-202 (LexisNexis 2017) (accomplice liability); *see also id.* § 76-5-202(1) (aggravated murder); *id.* § 76-2-103(1)–(2) (mens rea definitions). Based on the evidence presented at trial, we conclude that there is no reasonable probability that the jury would have acquitted Grunwald of this count if it had been correctly instructed on accomplice liability.

¶50    First, there is no reasonable probability that the jury based its verdict on a finding that Grunwald was merely reckless as to the results of her conduct. It was undisputed that Garcia was holding a gun and looking back at Sergeant Wride's patrol car when Garcia stated that he was "going to buck [the officer] in the fucking head." Although Grunwald claimed that she did not know the meaning of the term "buck" and assumed police cars had bulletproof windshields, no reasonable person could have

misinterpreted Garcia's objective under the circumstances. If Garcia had not been holding the gun when he stated his intent to do something to Sergeant Wride "in the head," the situation might have been more ambiguous, creating a real possibility that the jury convicted Grunwald for recklessly disregarding the risk that her conduct would result in the murder. But under the circumstances, there is no reasonable probability that the jury convicted on this basis.

¶51 Second, there is no reasonable probability that the jury convicted Grunwald because she aided Garcia in some way other than to commit the crime of aggravated murder. The undisputed evidence showed that, after Garcia announced his intention, Grunwald applied the brake, enabling the truck to shift into drive. It is unclear whether Grunwald or Garcia shifted the truck into drive, *see supra* ¶ 8 n.3, but there is no dispute that she did not immediately attempt to drive away or to shift back into park. Instead, she held her foot on the brake for three-and-a-half minutes while Garcia shifted in his seat to get into position to fire. Grunwald was observed watching traffic behind the truck from her side view mirror, which allowed her to see around Sergeant Wride's vehicle and to monitor the traffic approaching from behind. Garcia waited to open fire until there was a significant lull in traffic, leading to a reasonable inference that Grunwald was helping Garcia time the shooting to avoid witnesses and to ensure a safe and speedy getaway. In addition, Grunwald did not accelerate until after several shots were fired, strongly suggesting that she waited to flee until after the murder had been accomplished. By remaining stationary, keeping a lookout, and acting as the getaway driver, Grunwald enabled Garcia to fire the shots that killed Sergeant Wride.

¶52 Grunwald argues that "this evidence, the brake lights, the gear shifting, watching the traffic and eventually driving away," was "not the only evidence the jury heard of [Grunwald] soliciting, requesting, commanding, or aiding Garcia," and thus the jury could have relied on a different factual basis in reaching

its verdict. For example, Grunwald argues that the jury might have convicted her because she failed to tell Sergeant Wride that there was a warrant for Garcia's arrest, or that Garcia had just provided false information or even because she had aided Garcia in various ways in the past. We consider it highly improbable that the jury convicted on such a theory. In closing argument, the State asked the jury to find that Grunwald "intentionally aided the principal actor" when she prepared for the shooting by "shift[ing] her car into drive, and [putting] the brakes on, holding on until they're ready"; watched her mirror for a break in traffic so that "others would not witness the murder" and so that there would be no cars around to "preclude their getaway"; and then drove away to safety, "protecting herself and her man from apprehension." Given that the State focused solely on these actions in arguing that Grunwald was guilty on Count One, it is highly improbable that the jury would have convicted Grunwald based on other conduct.

¶53   Third, there is no reasonable probability that the jury convicted Grunwald on the theory that she knew Garcia was going to shoot Sergeant Wride but did not know that her conduct would result in Garcia committing that crime. As detailed above, the State presented persuasive evidence that Grunwald's own actions were designed to help Garcia commit the crime. Consequently, Grunwald's defense at trial depended on the jury believing her claim that Garcia pointed his gun at her head, compelling her to assist him. In returning a guilty verdict, the jury necessarily rejected the compulsion defense. Once it did so, the only reasonable conclusion from the evidence was that Grunwald intended or knew that her conduct in keeping the truck in drive with her foot on the brake, watching for a lull in traffic, and preparing to flee, would result in Garcia committing the crime of aggravated murder.

¶54   Even if the jury had been correctly instructed on accomplice liability, there is no reasonable probability that it

would have acquitted on Count One. Accordingly, we affirm Grunwald's aggravated murder conviction.

2.      The Carjacking (Count Eleven)

¶55    Similarly, there is no reasonable probability that but for the erroneous instructions the jury would have reached a different result on Count Eleven, which charged Grunwald as an accomplice to aggravated robbery based on the carjacking. To convict Grunwald of this crime, the State had to prove that Grunwald either intended that her conduct would result in Garcia committing the crime of aggravated robbery or that she was aware that her conduct was reasonably certain to result in Garcia committing that crime. *See* Utah Code Ann. § 76-2-202 (LexisNexis 2017) (accomplice liability); *id.* § 76-6-301 (robbery); *id.* § 76-6-302 (aggravated robbery); *id.* §§ 76-2-103(1)–(2) (mens rea definitions).

¶56    The evidence at trial showed that Grunwald and Garcia abandoned her disabled truck after exiting I-15 at the Nephi Main Street exit. The videotape introduced at trial shows Garcia running away from the truck and Grunwald following. Grunwald testified that as soon as they left the truck, Garcia told her "to find a fucking car." Grunwald ran toward a passing motorist's vehicle, waving the motorist down. On cross-examination, Grunwald acknowledged that she stopped the driver, enabling Garcia to "point his gun at her and get her out." As soon as the vehicle came to a stop, Grunwald opened the passenger side door and climbed in as Garcia ordered the driver out of the driver's seat at gunpoint.

¶57 In her testimony, Grunwald claimed that Garcia threatened her, at one point turning the gun on her and telling her "to fucking hurry." She testified that she "was scared for dear life" and had "no choice" but to participate in the carjacking. But once the jury had rejected her compulsion defense, the evidence left no room for any other conclusion

except that Grunwald intentionally aided Garcia to commit the carjacking.

¶58    Based on this evidence, there is no reasonable probability that the jury convicted Grunwald because she was merely reckless as to whether her conduct could result in a carjacking. Nor is there any question that she intentionally aided Garcia in committing the carjacking itself, as opposed to intentionally aiding him in some other manner. Finally, because Grunwald's mens rea with respect to the carjacking cannot be characterized as anything less than intentional, there is no reasonable probability that the jury convicted her based on the erroneous "knowingly" instruction. The evidence permitted no conclusion other than that Grunwald intended her own conduct in waving down a passing motorist to result in the carjacking. Accordingly, we affirm Grunwald's aggravated robbery conviction.

B.    Grunwald Has Established Prejudice on the Remaining Counts.

¶59    On the remaining counts, we conclude that there is a reasonable probability that Grunwald may have received a more favorable outcome but for the erroneous jury instructions. We begin with those counts arising from the shots fired at Trooper Blankenagel and at the semi-trailer truck, where the evidence suggesting that Grunwald intended or knew that her conduct would result in the principal crimes was weakest. We then turn to the convictions relating to the shooting of Deputy Sherwood. Although the State presented stronger evidence relating to those counts, our confidence in those convictions is ultimately undermined by the erroneous jury instructions.

1.    Shooting at Trooper Blankenagel (Count Five)

¶60    Count Five charged Grunwald as an accomplice to felony unlawful discharge of a firearm based on the shots Garcia fired at Trooper Blankenagel. The evidence presented at trial showed

that Trooper Blankenagel spotted Grunwald's truck on I-15 and gave chase. Grunwald saw Trooper Blankenagel following the truck with the patrol vehicle's overhead lights on, but she continued driving up to 110 miles per hour. After a few miles, Garcia fired at Trooper Blankenagel from the back window of the truck. The bullet did not strike the vehicle, but the pursuit ended when Trooper Blankenagel hit a spike strip that had been deployed to stop Grunwald.

¶61    At trial, the State argued that Grunwald intentionally aided Garcia "by driving and enabling him to shoot." The State argued that, by the time Garcia fired at Trooper Blankenagel, Grunwald was "more than aware of what [Garcia] could and would do," suggesting that she knew Garcia would fire at any officer who attempted to apprehend them but chose to continue driving anyway. On appeal, the State does not specifically address whether Grunwald suffered prejudice with respect to this count, other than to argue generally that the evidence overwhelmingly refuted Grunwald's compulsion defense and established that she was Garcia's willing partner throughout the crime spree.

¶62    In finding Grunwald guilty, the jury clearly rejected her attempt to distance herself from Garcia and found that she was a willing participant. But a willing participant as to what? As *Jeffs* makes clear, an accomplice must act with the requisite mental state "as to the results of [her] conduct" and "the results of [her] conduct must be a criminal offense." *State v. Jeffs*, 2010 UT 49, ¶ 44, 243 P.3d 1250.

¶63    Based on the evidence presented at trial, it is certainly possible the jury found that Grunwald intended or reasonably knew that her conduct—that is, continuing to drive, leaving Garcia free to aim and fire his gun—would result in Garcia shooting at Trooper Blankenagel. Garcia had demonstrated that he would open fire on law enforcement and the jury could have reasonably inferred that Grunwald intended or knew that her

conduct was reasonably certain to result in Garcia shooting at other pursuing officers. However, it is at least equally likely that the jury convicted because Grunwald intentionally aided Garcia by continuing to drive, even though she did not have the mental state required for the commission of the underlying crime—unlawful discharge of a firearm. Unlike the evidence supporting Count One, there was no evidence that Garcia announced his intention to discharge the firearm at Trooper Blankenagel or that Grunwald undertook some action specifically designed to accomplish that crime, such as holding her foot on the brake, watching for traffic, and fleeing as soon as the crime was accomplished.

¶64 There is a reasonable probability that the jury convicted on Count Five based on one or more of the three errors in the jury instructions. First, the jury may have improperly convicted Grunwald based on a reckless mental state, finding that Grunwald recognized that her conduct could result in Garcia discharging the firearm but chose to continue driving anyway. Second, there is a reasonable probability that the jury convicted even though it found that Grunwald's conduct in continuing to drive was directed to helping Garcia evade law enforcement, a different and uncharged crime, not to the commission of unlawfully discharging his firearm. And, third, there is a reasonable probability that the jury may have convicted without finding that Grunwald knew that her own conduct in driving the truck was reasonably certain to result in the crime. Because of the likelihood of a more favorable outcome if the jury had been correctly instructed, we must vacate Grunwald's conviction on Count Five.

2. The Shooting at the Semi-Trailer Truck (Counts Six and Seven)

¶65 Counts Six and Seven charged Grunwald as an accomplice to the crimes of felony discharge of a firearm and criminal mischief, respectively, based on the shooting that

damaged the semi-trailer truck. As in Count Five, the trial evidence relating to this event was sparse. Shortly after evading Trooper Blankenagel, as Grunwald continued to drive down I-15, Garcia fired three shots out the passenger side window at the semi-trailer truck.

¶66    Like Count Five, the State's theory of accomplice liability on Counts Six and Seven is based on Grunwald intentionally aiding Garcia by driving the truck. As a result, our analysis of Count Five applies equally here. There is a reasonable probability that the jury convicted Grunwald on Counts Six and Seven because she intentionally aided Garcia by continuing to drive, even though she did not intend or know that her conduct would result in Garcia firing at the semi-trailer truck. Given the lack of evidence showing that Grunwald acted with the requisite mental state to commit the underlying crimes, there is a reasonable probability that the jury would have had a reasonable doubt regarding Grunwald's guilt if it had been properly instructed. Therefore, we must vacate the convictions on Counts Six and Seven.

3.    The Shooting of Deputy Sherwood (Counts Two and Three)

¶67    Counts Two and Three charged Grunwald as an accomplice to the crimes of attempted aggravated murder and felony unlawful discharge of a firearm causing serious bodily injury, respectively. Both counts related to the shooting of Deputy Sherwood.

¶68    The evidence at trial showed that, as Deputy Sherwood approached the truck on Main Street in Santaquin, Grunwald initially accelerated and maneuvered past cars in an apparent attempt to outrun him. But then Grunwald suddenly applied her brakes, reducing the distance between her truck and Deputy Sherwood. At that point, Garcia fired through the truck's back window, striking Deputy Sherwood in the head and causing

serious bodily injury. Immediately after the shooting, Grunwald accelerated and then quickly made a U-turn to head back onto I-15.

¶69    In contrast to Counts Five through Seven, which relied solely on Grunwald's continued driving, the State presented evidence suggesting that she took additional action designed to enable the commission of these crimes. Specifically, the videotape from Deputy Sherwood's dash camera shows that Grunwald abruptly applied the brakes right before Garcia began firing. In closing argument, the State focused on Grunwald's conduct, arguing that "she hits her brakes, slows down, closes the gap between [her truck] and Deputy Sherwood" thereby "helping [Garcia] accomplish the attempted aggravated murder" and the felony discharge of a firearm resulting in serious bodily injury.

¶70    However, the evidence leaves significant doubt as to whether Grunwald intended that conduct to result in Garcia committing these crimes or knew it was reasonably certain to have such a result. At trial, Grunwald testified that she slowed down because of the traffic in front of her. This explanation was supported by the video from Deputy Sherwood's patrol car, showing slower vehicles ahead in Grunwald's lane. In addition, Deputy Sherwood testified that Grunwald would have had to slow down to avoid hitting the car in front of her.

¶71    On the other hand, there was also evidence to suggest that Grunwald did have the requisite intent to aid in the commission of these crimes. Grunwald knew that Garcia had previously fired at an officer, knew that they were being pursued by a police car, and knew that Garcia still had the gun. Grunwald admitted at trial that she could have used the left turn lane to swerve around the cars in her path. Immediately after Garcia fired at Deputy Sherwood, Grunwald sped up again. Based on this evidence, the jury reasonably might have inferred that she chose to suddenly brake at that moment, intending or knowing that her conduct

would give Garcia the opportunity to shoot at the officer in pursuit. Even without the braking, the jury could have reasonably inferred that Grunwald continued to drive the truck for the purpose of ensuring that Garcia's hands would be free to shoot at any pursuing officers. Had the jury been correctly instructed, this evidence would be sufficient to support the convictions on Counts Two and Three.

¶72 However, we lack confidence that the jury would have reached the same result but for the errors in the accomplice liability instructions. Once the jury rejected the compulsion defense, there was no question that Grunwald had intentionally aided Garcia by driving the truck. But the instructions failed to explain how that intentional aid must relate to the commission of the underlying offenses.

¶73 As in Counts Five through Seven, there is a reasonable probability that the jury convicted Grunwald of Counts Two and Three based on one or more of the errors in the jury instructions. First, the jury may have improperly convicted Grunwald because she intentionally aided Garcia by driving the truck even though she was merely reckless as to whether her continued driving would result in Garcia shooting at Deputy Sherwood. Second, the instructions allowed the jury to convict if Grunwald's purpose in driving the truck was to aid Garcia in avoiding apprehension or to achieve some objective other than the commission of the charged crimes. Third, the jury may have convicted Grunwald because she knew that Garcia's conduct, but not her own, was reasonably certain to result in Garcia firing at Deputy Sherwood.

¶74 In sum, given the evidence presented, there is a reasonable probability that the jury convicted on these counts without finding that Grunwald intentionally or knowingly directed her conduct to aid Garcia in committing the principal crimes. Accordingly, we vacate the convictions on these counts.

CONCLUSION

¶75    By failing to object to jury instructions that misstated the law regarding accomplice liability, Grunwald's trial counsel's performance fell below the level of representation guaranteed by the federal and state constitutions. Having carefully reviewed the evidence at trial, we conclude that there is no reasonable probability that the deficient performance affected the verdict on Counts One and Eleven, and therefore, we affirm those convictions. However, there is a reasonable probability that Grunwald may have secured an acquittal on the remaining counts had the jury been correctly instructed on the law. As a result, we vacate and remand for a new trial on Counts Two, Three, Five, Six, and Seven.[7]

_____

7. In so ruling, we recognize that Grunwald stands convicted of aggravated murder and aggravated robbery, for which she is serving consecutive sentences of twenty-five years to life and five years to life, respectively. Our remand for a new trial on the counts requiring reversal is the relief to which she is entitled for her partial success on appeal. Whether she will be retried on those counts is, of course, a judgment call for the State.