**2018 UT App 131**

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
ROBERT S. APODACA,
Appellant.

Opinion
No. 20140774-CA
Filed June 28, 2018

Third District Court, Salt Lake Department
The Honorable Randall N. Skanchy
No. 121911274

Lori J. Seppi, Attorney for Appellant

Sean D. Reyes and John J. Nielsen, Attorneys
for Appellee

JUDGE JILL M. POHLMAN authored this Opinion, in which
JUDGES KATE A. TOOMEY and DIANA HAGEN concurred.

POHLMAN, Judge:

¶1     Robert S. Apodaca appeals his convictions for one count of aggravated kidnapping, a first degree felony; one count of aggravated robbery, a first degree felony; and one count of obstruction of justice, a second degree felony. He contends the trial court erred in concluding that his incriminating statements to police were voluntary and thus admissible at trial as impeachment evidence. He also contends that his aggravated robbery conviction should be reversed because a jury instruction improperly stated the applicable mental state. We affirm.

BACKGROUND

*The Criminal Episode*

¶2     A codefendant (Codefendant) was one of the State's key witnesses against Apodaca. Codefendant testified at trial that in November 2012 he purchased a small number of oxycodone pills from a sixteen-year-old drug dealer (Victim) and snorted those drugs. He testified that later the same day, he contacted Apodaca and, referring to Victim, said, "I know this kid we can rob. We can scare him pretty good." Codefendant explained that he called Apodaca "[b]ecause [Apodaca] had a ride," and Apodaca told Codefendant that "he would come through" by picking up Codefendant. Codefendant further testified that he suggested Apodaca "find someone who's got a gun . . . 'cause if [Victim] sees there's a gun, he's going to . . . give [the drugs] up without a fight." Apodaca responded that he would "bring one of his homies." When Codefendant later met with Apodaca, another man carrying a gun (Shooter) was already in the car Apodaca was driving.

¶3     Codefendant testified at trial that he, Shooter, and Apodaca had a plan: after Victim got in the car to sell them drugs, they would "just pull out the pistol and scare him, make him give the pills up, and then kick him out of the car." As this happened, Codefendant would feign surprise and "act like [he] didn't know what was going on."

¶4     To carry out their plan, Codefendant called Victim and arranged to buy a larger quantity of oxycodone pills from him. Apodaca then drove Codefendant and Shooter to Victim's girlfriend's residence to meet Victim. Codefendant went inside the residence and persuaded Victim to come out, telling him "[t]hey wanted to do [the deal] in the car." Victim got in the backseat behind Apodaca, and Codefendant got in the backseat behind Shooter.

¶5     Soon after Victim began counting the oxycodone pills, Apodaca, "out of nowhere," shifted the car into gear and sped off. Immediately after the car pulled away, Shooter pistol-whipped Victim in the head with a .22 caliber revolver and then pointed it at Victim's head. Shooter demanded, "Give us those fucking pills."[1] Victim refused. Meanwhile, Codefendant leaned against the door, screaming, "Just give them the pills. . . . I don't want to die." Victim attempted to open the car door while the car was traveling at approximately forty miles per hour, but the door was locked and would not open. Victim "told them to let [him] out" of the car three or four times, but his pleas went unanswered.

¶6     Victim also testified at trial that he heard Apodaca say, "Fucking shoot him." Similarly, Codefendant testified that Apodaca said, "Pop his ass."[2] But on cross-examination, Codefendant expressed uncertainty about who said this and admitted that it "could have been" Shooter.

¶7     Shooter then shot Victim in the stomach. Although Victim tried to get the gun from Shooter, Shooter ultimately shot him three more times in the leg. Apodaca stopped the car, and Codefendant exited the car and pulled Victim out. When Victim was removed from the car, he no longer had the oxycodone pills

---

1. Victim testified at the preliminary hearing that Apodaca made this statement. But at trial, Victim testified it was Shooter who demanded the pills. After reviewing his preliminary hearing testimony, and after cross-examination on the issue, Victim conceded he could not recall who made the statement and agreed it was possible that both Apodaca and Shooter demanded the pills.

2. Codefendant interpreted the phrase "[p]op his ass" to mean "shoot him, or punch him, or hit with the gun."

and never received payment for them. Apodaca and Shooter sped away, swerving in and out of traffic and "blow[ing] through" several red lights.

¶8     When the police eventually searched Apodaca's car, the rear floor mats were missing, and the backseat looked as though it had been wet. The police saw blood stains under the rear driver's side seat as well as on the back of the driver's seat and headrest. Once the police apprehended Apodaca, they interviewed him and charged him with several crimes.

*The Motion to Suppress*

¶9     Before the case went to trial, Apodaca moved to suppress the statements he made during his interview with the police, asserting that the police violated his Fifth Amendment rights when they continued to question him after he had invoked his constitutional right to remain silent. Apodaca also asserted that the police obtained his statements through coercive inducement and that, as a result, his statements were involuntary and could not be used against him for any purpose.

¶10     In response, the State stipulated that it would not introduce Apodaca's statements in its case-in-chief. But the parties disagreed about whether the State could use Apodaca's statements to impeach his credibility if he testified inconsistently at trial. According to the State, Apodaca's statements were not coerced or involuntarily made, and therefore it could use those statements for impeachment purposes.

¶11     Apodaca's interview with two police detectives had three distinct segments. The first was the conversation between the first detective and Apodaca in the police squad car. The second segment took place while a second detective transported Apodaca from the squad car to the interview room. The third segment involved the conversation between Apodaca and both

detectives in an interview room at the police station. The first and third segments of the interview were recorded; the second was not. Because there was no record of the second segment, the trial court heard testimony from the second detective and Apodaca before ruling on the motion to suppress. This portion of the proceeding occurred on the second day of trial outside the presence of the jury.

*The First Segment*

¶12    The first detective began by telling Apodaca that he would advise Apodaca of his rights. Apodaca responded, "After you give me my rights though don't ask me no questions cuz [I'm] answering no questions bro." The detective informed Apodaca of his *Miranda* rights[3] and explained that he would not interrogate Apodaca but rather would give him "the opportunity to tell . . . [his] side." Apodaca asked, "What's that gonna do for me?" He also repeatedly asked to know the charges against him.

¶13    The detective relayed that Codefendant identified Apodaca as the car's driver but did not identify who the front passenger was. Apodaca denied shooting anyone and stated that he had done nothing wrong, to which the detective again said, "This is the opportunity for you to give me your side." Apodaca wanted to know whether he was "going to jail [that night] no matter what." The detective did not know and said he could ask. Apodaca then stated, "How can I not go to jail, you guys got to start making me feel more comfortable, cuz I could help anybody as long as I'm gonna get something in the process. I can

---

3. *Miranda v. Arizona*, 384 U.S. 436 (1966), requires that suspects be informed of their rights to remain silent and to counsel prior to custodial interrogation if the resulting evidence is to "be used against [them]." *Id.* at 478–79.

help you with a lot of things if I get something in the process," and he indicated that if the police wanted him to "give . . . somebody up," then they had to give something to him.

¶14   The detective told Apodaca he knew Victim was shot in Apodaca's car. When Apodaca asked again for the charges, the detective said he was unsure but thought Apodaca would be charged with aggravated assault. The detective then asked why Apodaca would not talk, to which he responded, "Cuz I'm not gonna incriminate myself or tell you about anyone else until I get someone [to] tell me you ain't going to jail." The detective told Apodaca he could not do that, but he encouraged Apodaca to talk with him instead of the other detectives because he understood Apodaca's background and his "hard life." Apodaca reiterated that he was not going to incriminate himself "unless [he was] getting some deals." The detective responded that he could not "give deals," only inquire. The detective then asked Apodaca how many people were in the car, and Apodaca responded, "How about you ask them what's it gonna take for me not to go to jail and maybe I can tell them these things if they're gonna guarantee me to not go to jail."

¶15   After a pause in the interview, during which the detective inquired about Apodaca's charges, the detective identified kidnapping and aggravated robbery among the possible charges, and told Apodaca, "There's no way that you're not going to jail tonight." Apodaca asked if he could talk to his girlfriend, and the detective said he would ask. Apodaca queried about whether their interaction was being recorded, and the detective answered, "Yeah . . . I have to record our conversation." Apodaca asked whether the detective could turn off the recorder. The detective responded, "You want me to turn [the recorder] off?" Apodaca then stated, "Maybe I'll talk to you a little more, it has to be off." Apodaca then implied that the State would add charges against him because he did not give a statement. The detective told him, "No dude that's not how we

work . . . . It's not up to us okay? . . . It's up to the prosecuting [attorneys] to make a decision . . . . All we do is recommend the charges from what we've come up with in our investigation that's all we can do. . . . They make the final decision."

¶16    Near the end of the first segment, Apodaca indicated that he understood the charges and, when asked whether he was sick or injured, Apodaca said, "I'm pretty sick to my stomach and I'm gonna need my methadone soon in the morning . . . . [W]hen I don't have that I can't even function." Apodaca also recognized he faced incarceration, stating, "I'm gonna do some time in jail . . . so I'm figuring . . . I got six months . . . without my family I can do that even though I didn't do shit." Apodaca then proposed, "I could set [Codefendant] up, I could buy some drugs from him for you guys . . . . Would that get me out of jail?" The detective responded by explaining that the authorities wanted to know what happened in the car and who was there. Apodaca then suggested that Codefendant must have been confused when he said Apodaca was in the car or that Codefendant was the shooter and was trying to divert blame by accusing someone else. The first segment ended with Apodaca's transfer from the police car to the interview room.

*The Second Segment*

¶17    Apodaca and the second detective each testified about what transpired during the unrecorded second segment. According to Apodaca, he invoked his rights upon arrest and said he did not want to speak. He then changed his mind and waived his rights during the third segment because the second detective told him during the second segment that if he explained what had happened, the detective would "write the DA and . . . make sure that [Apodaca would be] out by Christmas Day." Apodaca testified that he understood this as a "guaranteed" promise that he would be treated with leniency if he cooperated. He also testified that if he had not been promised

that he would be out within one month and by Christmas, he would not have waived his rights and spoken with the police. He added that he told the police "what [he] thought they wanted to hear." Apodaca also testified that, during the second segment, he told the detectives he was going to need his medication and they told him, "[J]ust talk to us; and then we'll make sure you get that." Apodaca explained that, without his medication, he would experience heroin withdrawal symptoms, including pain in his legs, back, and head, and that he "would sweat, shak[e]."

¶18 In contrast to Apodaca's testimony, the second detective testified that "no deal was ever made" during the second segment of the interview and that he did not give Apodaca "any definite answers about jail or Christmas." According to the detective, when he met Apodaca in the forensics area of the police station, he "struck up a conversation" with Apodaca about tattoos. Apodaca got upset when he overheard the detective tell another employee that Apodaca might be charged with attempted homicide and obstruction of justice, and Apodaca "began to question" the detective about why he would face those charges. Apodaca was "concerned about going to jail" and "did not want to snitch." The detective told Apodaca that "cooperation was a good thing," "it always look[ed] better to cooperate," and "now was a good time to cooperate if he was willing to do it." In response to Apodaca's concern that "his cooperation would not get back to the prosecutors in charge of his case," the detective reassured Apodaca that if he wanted to cooperate, the detective "would let the prosecution know that he decided to cooperate and take responsibility." Although Apodaca proposed other ways that the detective could pursue the investigation, he agreed to speak more with the detective in the interview room. The detective testified that when he said he was giving his word to Apodaca, he was reassuring him that he would pass along to the prosecuting attorneys information about Apodaca's cooperation. The detective testified that he followed through and did so.

*The Third Segment*

¶19    The transcript of the third segment began in the interview room. The following exchange ensued:

> [Apodaca]: I just hope that prosecuting attorney sees how much I'm giving up.
>
> [Detective]: I guarantee they will.
>
> [Apodaca]: I just hope I get out.
>
> [Detective]: Hey you've got my word alright.
>
> [Apodaca]: That would be the shit if I was out by Christmas man.
>
> [Detective]: No I hear ya.

After this exchange, Apodaca began making incriminating statements. When Apodaca articulated the suspicion that the detective already knew "everything," the detective said that he did but was giving Apodaca "a chance to let [him] know [what happened] as well." The detective then stated, "I said you guys were in trouble you know that it's a matter of how we deal with it from here . . . and I think it always looks better if you cooperate."

¶20    Although Apodaca made additional incriminating statements, he was reluctant to identify the shooter, explaining, "I guess I have to go to jail because . . . cuz I can't do that man. It's gonna be me on the paperwork snitching on my homeboy. . . . I can't man cuz my friends gonna read it when he gets caught and he's gonna tell everybody." Apodaca also expressed concern that he would "be in jeopardy" when he was released, and the detective reassured him, "When you get out . . . [and] [i]f you feel like you're in jeopardy you need to call me and

I will take care of it." Apodaca stated, "I'm still getting in jail whether I say his name or not. . . . Unless I get a better offer . . . I can't say anything." The detective asked, "Do you think it's gonna look a little bit worse if you don't go to jail and everybody else does?" Apodaca said there was "no benefit" to naming the shooter, and when the detective remarked that Apodaca's child is "not gonna have dad for a little while," Apodaca agreed and said "at least for a year."

¶21    At this point, the first detective entered the room and resumed questioning. The first detective urged Apodaca to think about Apodaca's child having an involved father in his life, but he also stated that he could not speak on behalf of the district attorney's office and could not "promise [Apodaca] anything." The detective reminded Apodaca that he grew up in "the same kind of life," and continued, "I can't guarantee what's going to happen in court, but I, I could tell you that it's gonna be helpful to know that you're being cooperative, and that's all we're trying to do here is give you the opportunity to do so." When Apodaca asked whether his cooperation would "make [him] go home faster," the detective responded, "I can't promise you something that I can't guarantee. . . . I can tell you this it's gonna come out a lot better for you if you're truthful." The detective then said, "I want you to tell me the truth of what you witnessed and I guarantee you that [the prosecutors are] gonna look at that hard and they're gonna realize that you're being helpful with this investigation . . . and you being with . . . your son it's gonna be . . . better for you than for you to be sitting in a cell for the rest of your life." The detective reiterated, "I can't guarantee any of this stuff [you're] asking." Apodaca then made more incriminating statements.

*The Parties' Arguments and the Trial Court's Ruling*

¶22    Apodaca argued to the trial court that his statements were elicited in violation of his *Miranda* rights and could be used

against him for impeachment purposes only if they were voluntarily and freely given and without compulsion or coercion. He then argued that his "complete shift" regarding cooperation between the first segment and the third segment was explained by police inducement, in the form of a promise that he would get out of jail by Christmas. Because he was induced into making the statements, Apodaca asked the court to find that they were involuntary and therefore could not be admitted for any purpose. The prosecutor countered that there was no inducement and that the evidence showed "no Christmas promise that was made to [Apodaca]."

¶23   The court concluded that Apodaca's statements were obtained in violation of *Miranda* and could not be used in the State's case-in chief. However, based on the testimony and the parties' arguments, the court found that "there was no coercion or duress associated with the statements made by Mr. Apodaca." The court further explained,

> And really on the spectrum of this idea of trickery or coercion—the suggestion that somebody has— engages in voluntary conversations doesn't rise to the level of what might otherwise be duress or coercion, nor is a promise to pass on information associated with Mr. Apodaca's cooperation, which is what this Court understands that testimony to be—an inducement for which somehow would obviate the voluntary nature of freely given information by Mr. Apodaca.

The court concluded that it would allow the State to use Apodaca's statements for impeachment purposes.

*The Trial*

¶24   Apodaca was tried by a jury on one count of aggravated kidnapping, one count of aggravated robbery, one count of

obstructing justice, and four counts of felony discharge of a firearm. The aggravated robbery count and the discharge of a firearm counts were based on accomplice liability, meaning that the State sought to hold Apodaca criminally liable for Shooter's acts of robbing Victim and discharging the gun.

¶25   In opening statements, defense counsel set the foundation for a compulsion defense. Counsel explained to the jury that it would hear that Apodaca was offered drugs in exchange for giving Shooter and Codefendant a ride. According to defense counsel, Apodaca did not know that Shooter had a gun and was surprised when Shooter pulled it out and announced that they were going to rob Victim. Apodaca was "afraid of" and "intimidat[ed]" by Shooter, and when he was "ordered to drive . . . that's what he did." Defense counsel also told the jurors that "if [Apodaca's] life was threatened and he was told that he had to participate or he himself was going to get hurt, [they] will hear that the law provides that in certain circumstances you're allowed to do exactly what [Apodaca] did: drive that car."

¶26   Victim and Codefendant both testified against Apodaca. Although Apodaca had planned to testify in his own defense, he changed his mind and elected not to testify "in light of the . . . suppression ruling." As defense counsel explained to the court, "if [Apodaca] testifies, he's subjecting himself to impeachment."

¶27   Relatedly, Apodaca withdrew his request for a compulsion instruction. In closing statements, defense counsel argued that the State had not met its burden of proof and urged the jury to disregard Codefendant's testimony. Defense counsel questioned the accuracy and credibility of the State's witnesses by highlighting inconsistencies in their statements, Victim's allegedly imperfect perception of a stressful event, and Codefendant's motivations and shifting stories. In addition, defense counsel cast blame on Shooter, arguing Apodaca was not a party to Shooter's crimes. Defense counsel asserted that

Apodaca "didn't assist anyone," "was doing what he was told, [and was] found in the circumstances that he didn't want to be in."

¶28  The court instructed the jury regarding the concepts of accomplice liability and culpable mental states. The court also provided the jury with definitions of the terms "intentionally" and "knowingly." Relevant to this appeal, Instruction 36 explained the elements of the crime of aggravated robbery. That instruction directed the jury that, if it found all the other elements of the offense, it could find Apodaca guilty of aggravated robbery so long as it found that he "a. Intended that [Shooter] commit the crime of Aggravated Robbery; or b. Was aware that his conduct was reasonably certain to result in [Shooter] committing the crime of Aggravated Robbery."

¶29  After the court submitted the case to the jury, the jury sent a note to the court asking:

> If someone assists in detaining an individual and
> was knowing about plans to scare said individual
> to give up their personal property, that is
> aggravated kidnapping, but if they only assisted in
> the act of detainment under threat for their own
> life, does that still leave them at fault as it being
> intentional on the party in question?
>
> Does action under duress change intent?

The court responded, "The Court refers you to jury instruction[] 9, what evidence is, or is not, instruction[] 29 on a defendant's mental state, instructions 33 and 34 on accomplice liability and instruction 43 on intentionally and knowingly."

¶30  The jury acquitted Apodaca of all four counts of felony discharge of a firearm, but it convicted him of aggravated

kidnapping, aggravated robbery, and obstructing justice. Apodaca appeals.

ISSUES AND STANDARDS OF REVIEW

¶31 First, Apodaca contends that the trial court "incorrectly concluded that [his] statements to police were voluntary and, therefore, admissible as impeachment evidence." "The ultimate determination of voluntariness is a legal question; accordingly, we review the district court's ruling for correctness." *State v. Rettenberger*, 1999 UT 80, ¶ 10, 984 P.2d 1009. We review the trial court's underlying factual findings for clear error.[4] *Id.* A trial court's factual findings are clearly erroneous "only if they are

---

4. The Utah Supreme Court has recently explained that "where the [trial] court's decision [on a motion to suppress] is based entirely on its review of the interrogation transcripts and the court's interpretation of the law, the question is more law-like than fact-like," and thus we owe the trial court no deference in reviewing that decision. *Met v. State*, 2016 UT 51, ¶ 34, 388 P.3d 447 (quotation simplified). The supreme court has also stated that "when a [trial] court relies on live testimony in an evidentiary hearing where the defendant, interrogators, or other relevant individuals testify regarding the circumstances of the confession and the defendant's characteristics and state of mind at the time of the confession, some deference may be appropriate." *State v. Arriaga-Luna*, 2013 UT 56, ¶ 8, 311 P.3d 1028. Because the trial court's decision relied on transcripts as well as live testimony, this case may be one to which some deference may be appropriate. *See id.* But we need not decide this question. Both parties ask us to review the trial court's underlying factual findings for clear error and its ultimate decision for correctness. We would affirm the trial court's decision under either standard.

against the clear weight of the evidence, or if we otherwise reach a definite and firm conviction that a mistake has been made." *State v. Hinmon*, 2016 UT App 215, ¶ 9, 385 P.3d 751 (quotation simplified). "Our role is not to reweigh the evidence, but to determine only if the appellant has demonstrated a lack of evidentiary support for the trial court's findings." *Salt Lake City v. Reyes-Gutierrez*, 2017 UT App 161, ¶ 22, 405 P.3d 781 (quotation simplified).

¶32 Second, Apodaca contends that the trial court "improperly instructed the jury that it could convict [him] of aggravated robbery as a party if it found that Apodaca acted knowingly." Because he did not preserve this issue at trial, he asks us to reach the issue under the rubric of ineffective assistance of counsel.[5] *See State v. Bond*, 2015 UT 88, ¶ 46, 361 P.3d 104 (recognizing the ineffective assistance of counsel doctrine as an exception to the preservation rule). We decide a claim of ineffective assistance of counsel raised for the first time on appeal as a matter of law. *Layton City v. Carr*, 2014 UT App 227, ¶ 6, 336 P.3d 587.

## ANALYSIS

### I. The Voluntariness of Apodaca's Statements to the Detectives

¶33 Apodaca contends that the trial court erred by ruling that his incriminating statements to the detectives, though inadmissible during the State's case-in-chief, were admissible to impeach him should he testify inconsistently. Although the State ultimately did not use Apodaca's statements at trial, he contends that his convictions should be reversed because the alleged error

---

5. Apodaca also asks us to review this issue under the plain error and manifest injustice exceptions to the preservation rule. *See infra* note 14.

violated his constitutional rights or because the ruling deterred him from testifying on his own behalf.

¶34 Individuals are protected from being compelled to incriminate themselves under the Fifth and Fourteenth Amendments to the United States Constitution.[6] *State v. Arriaga-Luna*, 2013 UT 56, ¶ 9, 311 P.3d 1028 (citing U.S. Const. amends. V, XIV; *Malloy v. Hogan*, 378 U.S. 1, 6 (1964)). "The United States Supreme Court has held that 'although statements taken in violation of only the prophylactic *Miranda* rules may not be used in the prosecution's case in chief, they are admissible to impeach conflicting testimony by the defendant.'" *State v. Troyer*, 910 P.2d 1182, 1190 (Utah 1995) (quoting *Michigan v. Harvey*, 494 U.S. 344, 350–51 (1990)). The rationale is that "if defendants exercise their right to testify on their own behalf, they assume a reciprocal 'obligation to speak truthfully and accurately.'" *Id.* (quoting *Harvey*, 494 U.S. at 351). Put another way, the law does not permit "a defendant to 'turn the illegal method by which evidence in the Government's possession was obtained to his own advantage, and provide himself with a shield against contradiction of his untruths.'" *Id.* (quoting *Harvey*, 494 U.S. at 351); *see also Oregon v. Hass*, 420 U.S. 714, 722 (1975) ("[T]he shield provided by *Miranda* is not to be perverted to a license to testify inconsistently, or even perjuriously, free from the risk of

---

6. Apodaca refers in his brief to the federal and state constitutions, asserting that they both "prohibit the admission of involuntary statements." "As a general rule, we will not engage in a state constitutional analysis unless an argument for different analyses under the state and federal constitution is briefed." *State v. Harris*, 2004 UT 103, ¶ 23, 104 P.3d 1250 (quotation simplified). Because Apodaca does not argue for greater protection under the Utah Constitution than is afforded by the United States Constitution, we will not engage in a separate state constitutional analysis.

confrontation with prior inconsistent utterances."). As a result, even when obtained in violation of *Miranda*, a defendant's statements may be admissible for impeachment purposes provided that the defendant gave those statements voluntarily and interrogators did not coerce them. *See Met v. State*, 2016 UT 51, ¶ 54, 388 P.3d 447.

¶35    "The ultimate goal of analyzing whether a confession was coerced is to determine 'whether, considering the totality of the circumstances, the free will of the witness was overborne.'" *Arriaga-Luna*, 2013 UT 56, ¶ 9 (quoting *United States v. Washington*, 431 U.S. 181, 188 (1977)). The State bears the burden of demonstrating "by a preponderance of the evidence that the statement was made voluntarily based upon the totality of circumstances." *State v. Rettenberger*, 1999 UT 80, ¶ 45, 984 P.2d 1009 (quotation simplified).

¶36    The totality of the circumstances includes both "the details of the interrogation" and "the characteristics of the accused." *Id.* ¶ 14 (quotation simplified). Details of the interrogation include external factors, such as "the duration of the interrogation, the persistence of the officers, police trickery, absence of family and counsel, and threats and promises made to the defendant by the officers." *Id.* The characteristics of the accused include "such factors as the defendant's mental health, mental deficiency, emotional instability, education, age, and familiarity with the judicial system." *Id.* ¶ 15. "Additionally, for a confession to be involuntary there must be a causal connection between the coercion and the confession." *Arriaga-Luna*, 2013 UT 56, ¶ 10.

¶37    Apodaca asserts that the totality of the circumstances demonstrates that his statements were involuntary, relying on the detectives' "significant use of threats and promises regarding Apodaca's ability to be released," as well as "a *Miranda* violation, the false friend technique and other misrepresentations,

isolation, denial of medication, and the officers' use of Apodaca's subjective characteristics to coerce him into confessing." According to Apodaca, his statements were induced by a deal under which the second detective, "in exchange for Apodaca's cooperation, would convince the prosecutor to release Apodaca by Christmas." Apodaca alleges that the first detective "also made statements that appeared to guarantee leniency." In Apodaca's view, together all of these circumstances "demonstrate the unacceptably coercive nature of this interrogation."

¶38 The State, in contrast, argues that the totality of the circumstances in this case shows that, rather than having his will overcome, Apodaca was negotiating with open eyes and was merely trying to secure the best deal possible. We agree with the State.

¶39 We begin by addressing Apodaca's arguments regarding the detectives' use of threats and promises. We then address his arguments regarding the conceded *Miranda* violation, the false friend technique, misrepresentations, isolation, denial of medication, and the alleged use of Apodaca's subjective characteristics to coerce his confession.[7]

---

7. The State contends that Apodaca's challenge to the trial court's decision allowing for the admission of the incriminating statements for impeachment purposes is unpreserved "[b]ecause Apodaca never proffered *to the court* what his testimony would have been." In *Met v. State*, the supreme court noted that "[p]reservation appears to be an inapt label" for a defendant's failure to proffer testimony in the face of a similar ruling. 2016 UT 51, ¶ 57 n.14, 388 P.3d 447. The supreme court explained that, in the case at hand, by moving the trial court to suppress the incriminating statements and by specifically responding to the

(continued…)

A.     Threats and Promises

¶40     Apodaca contends that his statements "were involuntary because the officers made impermissible threats and promises that caused [him] to confess." In so arguing, Apodaca relies on two alleged promises that he believes constituted improper inducement. First, Apodaca asserts that, in exchange for his

---

(…continued)

State's argument that those statements should be admissible for impeachment, the "concerns that animate [the] preservation rules" were satisfied. *Id.* The issue was not lack of preservation in the traditional sense, "but rather the lack of a record to assess whether the alleged error would, in actuality, have had any impact on the outcome of the trial." *Id.* A "defendant must, by some means, create and present a record in the [trial] court sufficient to permit meaningful appellate review" as to whether the alleged error was harmful. *Id.* ¶ 62. This includes establishing that "he would have testified and that his testimony would have provoked impeachment by his prior [statements]" to allow the reviewing court to determine "how that testimony and imagined impeachment would have changed the evidentiary landscape." *Id.* ¶ 63.

    Here, the record is sufficient for us to determine that Apodaca would have indeed testified and that his testimony would have provoked the State to impeach him with his prior statements. Defense counsel's opening statement, which preceded the trial court's ruling, demonstrated that Apodaca intended to testify and that his testimony would relate to compulsion. However, because we conclude that the trial court did not err in ruling that Apodaca's statements to the detectives were not coerced and could be used for impeachment, we need not consider whether the impact of that testimony and subsequent impeachment would have affected the overall evidentiary picture.

cooperation, the second detective promised that he "would convince the prosecutor to release [him] by Christmas." Second, Apodaca asserts that the first detective "also made statements that appeared to guarantee leniency."

### 1.     The Alleged Christmas Promise

¶41     Much of Apodaca's argument on appeal centers on the alleged Christmas promise. Apodaca explains that during the first segment of his interview with the detectives, he "would not talk . . . unless they offered him a deal." He then explains that his "position shifted dramatically between the first and third segments" of the interview, asserting that the "record supports that [he] agreed to waive his rights and speak to police [during the third segment] because he had struck a deal with [the second detective]" during the second segment. According to Apodaca, "[i]t appears from the record that the deal was that [the detective], in exchange for [his] cooperation, would convince the prosecutor to release [him] by Christmas."

¶42     The State counters that "there were conflicting accounts of the conversation" between Apodaca and the second detective during the second segment and that the "trial court's ruling of no coercion shows that the court believed [the detective] and disbelieved Apodaca." The State also argues that the only promise the detective made—that "he would relay any of Apodaca's cooperation to the prosecuting attorney"—was "a non-coercive promise." We agree with the State on both points.

¶43     After hearing argument from counsel and testimony from Apodaca and the second detective, the trial court concluded that "there was no coercion or duress associated with" Apodaca's statements. The court explained that "a promise to pass on information associated with Mr. Apodaca's cooperation, which is what this Court understands that testimony to be," does not rise to the level of an inducement that would "obviate the

voluntary nature of freely given information by Mr. Apodaca." The court's statements indicate that it credited the detective's testimony regarding the nature of his promise to Apodaca—that he told Apodaca that he "would let the prosecution know that [Apodaca] decided to cooperate." The court thereby implicitly rejected Apodaca's testimony that the detective promised him that he would be out of jail by Christmas.

¶44     Apodaca's argument on appeal regarding the first alleged promise requires this court to set aside the trial court's implicit finding that the only promise the detective made was that he would pass along to the prosecutors information regarding Apodaca's cooperation. But "because a trial court is in a better position to judge credibility and resolve evidentiary conflicts," an appellate court will not set aside the trial court's factual findings absent clear error. *Brown v. State*, 2013 UT 42, ¶ 37, 308 P.3d 486 (quotation simplified). For Apodaca to show clear error, "he must identify the supporting evidence and explain why the trial court's factual finding is nonetheless against the clear weight of the evidence." *See Salt Lake City v. Reyes-Gutierrez*, 2017 UT App 161, ¶ 25, 405 P.3d 781. Apodaca fails to do so if he "simply restate[s] or review[s] evidence that points to an alternate finding or a finding contrary to the trial court's finding of fact." *See id.* (quotation simplified).

¶45     Apodaca acknowledges his and the detective's "conflicting memories." He further acknowledges the detective's testimony that "he knew Apodaca did not want to speak unless he was offered a deal," that "no deal was ever made," and that the detective "promised only to let the prosecution know about Apodaca's cooperation." (Quotation simplified.) Yet Apodaca asserts that "the first and third segments of the interrogation support Apodaca's, not [the detective's], recollection of the second segment" and substantiate his claim that the detective promised to write the prosecutors and make sure that Apodaca was out of jail by Christmas. Apodaca's recounting of evidence

that would have supported an alternate finding does not establish that the trial court's finding was against the clear weight of the evidence. *See id.*; *see also State v. Menzies*, 845 P.2d 220, 226 (Utah 1992) ("[T]he existence of conflicting evidence is not sufficient to set aside a trial court's finding."). Accordingly, we conclude Apodaca has not shown clear error in the trial court's finding that the second detective offered only to pass along information about Apodaca's cooperation to the prosecutors.

¶46   Given this conclusion, we consider only whether that promise is coercive. It is not. As our supreme court has explained, "the mere representation to a defendant by officers that they will make known to the prosecutor and to the court that he cooperated with them . . . [has] been recognized as not coercive." *State v. Strain*, 779 P.2d 221, 225 (Utah 1989) (quotation simplified). Here, the detective promised only that he would inform the prosecutors of Apodaca's cooperation. Thus, we agree with the trial court that the second detective's promise, standing alone, was not coercive.

2.      The Alleged Guarantee of Leniency

¶47   As for the second alleged promise, Apodaca asserts that the first detective "appeared to guarantee leniency." In support, Apodaca relies on the following statement that the detective made when trying to persuade him to reveal the identity of the shooter: "I guarantee you that [the prosecutors are] gonna look at that hard and they're gonna realize that you're being helpful with this investigation . . . and you being with your girl and your son it's gonna be . . . better for you than for you to be sitting in a cell for the rest of your life."

¶48   We do not read the first detective's statement as guaranteeing leniency to Apodaca in return for his cooperation. At most, the detective guaranteed that the prosecutors would be

aware of and consider Apodaca's cooperation and his helpfulness to the investigation when handling his case. Further, the statement came after Apodaca began making incriminating statements and was the latter portion of the detective's response to Apodaca's question, "So do you think this will make me go home faster . . . ?" In his initial response to this question, the detective told Apodaca, "I can't promise you something that I can't guarantee." The detective then urged Apodaca to be truthful so that things would "come out a lot better for [him]." On its face and in context, the detective's statement does not guarantee Apodaca a certain result. Instead, the context shows that the detective was suggesting to Apodaca that cooperating would be his best option; such a suggestion is not coercive.[8] *See id.* (indicating that it is not coercive for officers to tell a defendant that "full cooperation would be his best course of action").

¶49   Moreover, the record demonstrates that the first detective told Apodaca multiple times that he could not make promises or guarantees about his incarceration. For example, during the first segment when Apodaca said he would not incriminate himself unless someone told him that he was not going to jail, the first detective said he could not do that or "give deals." And during the third segment, the same detective stated that he could not

---

8. The portion of the detective's statement that it would be better for Apodaca to be with his child than in a cell his entire life arguably suggests a promise of leniency, but the statement's context demonstrates that it was not made to coerce a confession from Apodaca about his involvement in the crime; the detective was encouraging Apodaca to identify the shooter rather than assume greater responsibility for the crime. *Cf. State v. Strain*, 779 P.2d 221, 226 (Utah 1989) (explaining that police conduct is impermissibly coercive when it "carrie[s] a threat of greater punishment or a promise for lesser punishment depending on whether [the accused] confesse[s]").

speak on behalf of the district attorney's office and could not "promise . . . anything." Because the detective did not guarantee leniency to Apodaca, and because the only promise made to Apodaca was not coercive, *see supra* ¶ 46, the detectives' alleged use of threats and promises does not weigh in favor of a conclusion of coercion.

B.     The *Miranda* Violation

¶50     Apodaca contends that the first detective's "disregard of [his] *Miranda* rights had the coercive effect of demonstrating to [him] that invoking his rights would not end the interrogation." "[A] *Miranda* violation alone is insufficient grounds for suppressing statements offered to impeach the defendant's testimony." *United States v. Murdock*, 667 F.3d 1302, 1306 (D.C. Cir. 2012) (citing *Oregon v. Hass*, 420 U.S. 714 (1975); *Harris v. New York*, 401 U.S. 222 (1971)); *see also Parsad v. Greiner*, 337 F.3d 175, 184–85 (2d Cir. 2003) ("[T]he mere fact that a police officer takes a statement after a suspect invokes his right to remain silent does not, standing alone, render that statement the product of coercion."). But "a *Miranda* violation may be considered in a voluntariness analysis." *State v. Kozlov*, 2012 UT App 114, ¶ 56, 276 P.3d 1207; *see also Murdock*, 667 F.3d at 1306 ("The detective's failure to honor [the defendant's] *Miranda* right is certainly relevant to whether [the defendant's] statements were voluntary, but it is insufficient by itself to establish involuntariness."). The State concedes that the detectives obtained Apodaca's statements in violation of his *Miranda* rights, and we agree with Apodaca that this factor weighs in favor of a conclusion of coercion.

C.     False Friend Technique

¶51     Apodaca contends that the "false friend technique . . . contributed to the coercion," causing him to make incriminating statements. According to Apodaca, the first detective built

rapport by "sympathiz[ing] with Apodaca's 'hard life' and encourag[ing] Apodaca to trust him." The second detective likewise built rapport with him by encouraging Apodaca to trust him and offering to protect Apodaca when he got out of jail. Apodaca asserts that he "believed the officers' claims of concern and friendship," and "made the incriminating statements because he believed that the officers would help him if he did."

¶52 The false friend technique is one "whereby the interrogator represents that he is a friend acting in the suspect's best interest." *State v. Montero*, 2008 UT App 285, ¶ 18, 191 P.3d 828. "Standing alone, the false-friend technique is not sufficiently coercive to produce an involuntary confession, but may be significant in relation to other tactics and factors." *Id.* (quotation simplified). "The false-friend technique may be coercive if a defendant has 'below-average cognitive abilities' or other cognitive disabilities." *State v. Leiva-Perez*, 2016 UT App 237, ¶ 19, 391 P.3d 287 (quoting *State v. Rettenberger*, 1999 UT 80, ¶ 26, 984 P.2d 1009). For example, in *Rettenberger*, the Utah Supreme Court determined the false friend technique contributed to the coercive nature of an interrogation where the defendant suffered from "mental disabilities and deficiencies." 1999 UT 80, ¶ 28.

¶53 While it is apparent from the record that the detectives attempted to build rapport with Apodaca by sympathizing with him and encouraging him to cooperate with the investigation, Apodaca has not shown that he has "below-average cognitive abilities" or "mental disabilities and deficiencies" that heightened his susceptibility to the false friend technique like the defendant in *Rettenberger*. *See id.* ¶¶ 26, 28. To the contrary, Apodaca's interactions with police show him as a savvy negotiator protecting his own interests by offering to trade information in exchange for leniency. Further, this case is more like *Leiva-Perez*, where this court determined that the use of the technique weighed against a conclusion of coercion where the police made "innocuous representations" that they wanted to be

able to work with the defendant and that they thought he was "a good person." 2016 UT App 237, ¶¶ 20–21 (quotation simplified).

¶54 The only statement that arguably exceeds these bounds is the second detective's personal offer to help Apodaca if he was threatened as a result of naming the shooter. In *State v. Arriaga-Luna*, the Utah Supreme Court stated that the detective in that case "strayed close to the line" when during the interrogation he made a similar personal offer to help the defendant's family. 2013 UT 56, ¶ 19, 311 P.3d 1028. However, despite expressing concern about the statement and advising that officers should not imply that aid is contingent on a confession, the court concluded that the statement was not coercive because it was made in response to the defendant's inquiry about what would happen to his family and "not in exchange for a confession." *Id.* Similarly, here, the detective's offer to personally protect Apodaca was made *after* Apodaca had implicated himself and in response to Apodaca's expression of concern about retaliation if he were to name the shooter. We thus conclude that the false friend technique does not weigh in favor of coercion.

D. Misrepresentations

¶55 Apodaca contends that the detectives' "misrepresentations contributed to the coercion." "A defendant's will is not overborne simply because he is led to believe that the government's knowledge of his guilt is greater than it actually is." *Rettenberger*, 1999 UT 80, ¶ 20 (quotation simplified). "Generally, police 'half-truths regarding the strength of the evidence' against a defendant are not 'sufficient to overcome [a defendant's] free will and spirit.'" *Leiva-Perez*, 2016 UT App 237, ¶ 22 (alteration in original) (quoting *State v. Galli*, 967 P.2d 930, 936 (Utah 1998)). "However, in certain cases, police misrepresentations may be sufficiently egregious to overcome a

defendant's will so as to render a confession involuntary." *Rettenberger*, 1999 UT 80, ¶ 20.

¶56 According to Apodaca, the first detective "started the interrogation with a lie," telling him that it "was not an interrogation at all, but an opportunity." Near the beginning of the first segment, the detective told Apodaca, "[M]y opportunity here is not to question you, not to interrogate you but to give you the opportunity to tell me your side." Even assuming this statement could be characterized as misleading, it did not exaggerate the strength of the evidence against Apodaca, *see Leiva-Perez*, 2016 UT App 237, ¶ 22, and we are not persuaded it constituted an egregious misrepresentation that weighs in favor of coercion, *see Rettenberger*, 1999 UT 80, ¶ 20; *cf. Montero*, 2008 UT App 285, ¶ 13 (stating that a detective was not "overzealous in his pursuit of the truth," in part, because he gave the defendant "every opportunity to explain" himself). And while Apodaca identifies other points in the interview where the detectives suggested "that they had plenty of evidence, including video surveillance and witnesses," he has not shown that, even if these instances were half-truths, they were sufficient to overcome his will. *See Leiva-Perez*, 2016 UT App 237, ¶ 22.

E. Isolation and Duration of the Interrogation

¶57 Apodaca contends that "the officers' use of isolation . . . contributed to the coerciveness of the interrogation." He asserts that he was isolated from his friends, family, and an attorney and that he was questioned late at night in a hostile setting.

¶58 "[W]hether the defendant was subjected to extended periods of incommunicado interrogation" is "[a]nother important consideration." *State v. Rettenberger*, 1999 UT 80, ¶ 33, 984 P.2d 1009. While cases involving "prolonged isolation from family or friends in a hostile setting" may contribute to a Fifth Amendment violation, *State v. Troyer*, 910 P.2d 1182, 1188 (Utah

1995) (quotation simplified), there is "no specific time limit," and "interrogations ranging from five to six hours have been held to be non-coercive," *State v. Leiva-Perez*, 2016 UT App 237, ¶ 14, 391 P.3d 287; *see also id.* ¶¶ 14–15 (concluding that the length of the interrogation, ninety-five minutes, weighed against a conclusion of coercion); *State v. Montero*, 2008 UT App 285, ¶ 12, 191 P.3d 828 (concluding that a six-hour non-continuous interrogation was non-coercive, and stating that the "duration of an interrogation has typically been viewed as coercive only when it is much longer" than six hours).

¶59    Apodaca's isolation lasted, at most, about four hours. He was arrested shortly after 9 p.m., and the third segment of the interview ended around 1 a.m. Apodaca's four hours of isolation are less than the five to six hour interrogations that have been deemed non-coercive, and his isolation similarly does not weigh in favor of coercion. *See Leiva-Perez*, 2016 UT App 237, ¶¶ 14–15.

¶60    Apodaca also complains that the detectives denied his two requests to speak to his girlfriend. While a police officer's non-responsiveness to a defendant's requests to call family or friends can weigh in favor of coercion, even repeated denials of requests to speak to friends or family have been deemed not to render involuntary an otherwise voluntary confession. *Compare Rettenberger*, 1999 UT 80, ¶ 35 (observing that officers "brush[ing] aside" the defendant's several requests to call his mother contributed to the coerciveness of the interrogation), *with State v. Werner*, 2003 UT App 268, ¶¶ 33–35, 76 P.3d 204 (concluding that the detective's "repeated denials of [the defendant's] requests to speak to his girlfriend" did not "render involuntary an otherwise voluntary confession"). Here, the detectives brushed off only one request before Apodaca incriminated himself. The detectives' deferral of his requests to talk to his girlfriend does not weigh in favor of a conclusion of coercion. *See Montero*, 2008 UT App 285, ¶ 20 (concluding there

was no impropriety in temporarily ignoring the defendant's single request to call his mother).

F.     Medication

¶61    Apodaca contends that the detectives' "denial of medication contributed to the coerciveness of the interrogation," asserting that they "hinged [his] access to medication on whether he spoke to police." The State concedes that "conditioning receipt of necessary medication on a defendant's confession could be coercive," but it maintains that there was no such condition here.

¶62    We agree with the State that the record does not support Apodaca's assertion that the detectives denied him medication. Near the end of the first segment, Apodaca told the first detective, "I'm pretty sick to my stomach and I'm gonna need my methadone soon in the morning . . . . [W]hen I don't have that I can't even function." Apodaca's statement amounted to a request for medication in the future and did not signal that he had an immediate need of it. Because Apodaca did not tell the detectives then or at any other point that he had an immediate need for medication,[9] the detectives did not purport to condition receipt of necessary medication on Apodaca's incriminating statements. *Cf. id.* (rejecting the defendant's complaint that a detective impermissibly brushed aside his concerns about vomiting because "he never again mentioned a need to throw up after raising the possibility just once," and observing that "[h]ad

---

9. Apodaca testified that during the unrecorded second segment he again informed the detectives that he was "going to need [his] medicine." The trial court made no findings regarding this assertion. But even assuming Apodaca made a second request for medication, the request apparently was not substantively different from his first.

he been truly exhausted or ill, he would have renewed his requests" to lie down and call his mother). Because the record does not support Apodaca's claim regarding the denial of medication, this factor weighs against a conclusion of coercion.

G.    Apodaca's Subjective Characteristics

¶63    Apodaca also contends that the detectives "took advantage of [his] subjective characteristics in order to coerce him into confessing." In particular, he argues that the detectives exploited his lack of legal training, his desire to avoid jail, and his resolve not to talk unless he had a deal.[10]

¶64    Courts consider a defendant's "subjective characteristics, especially as known to the interrogating officers, to determine the extent to which those characteristics made him more susceptible to manipulation." *State v. Rettenberger*, 1999 UT 80, ¶ 37, 984 P.2d 1009. "[A] confession may be suppressed in circumstances in which a police officer knows of a suspect's mental illness or deficiencies at the time of the interrogation and effectively exploits those weaknesses to obtain a confession." *Id.* ¶ 18.

¶65    Apodaca asserts that the detectives took advantage of his lack of legal training. *Cf. id.* ¶ 37 (expressing heightened concern of suggestibility where, among other things, "the defendant had had little prior experience with the judicial system"); *State v. Montero*, 2008 UT App 285, ¶ 21, 191 P.3d 828 (taking into consideration the defendant's familiarity with the legal system, as evidenced by his criminal history). But we agree with the

---

10. Regarding his subjective characteristics, Apodaca also asserts that the detectives took advantage of his drug addiction and his need for medication. We have already rejected this contention. *See supra* ¶¶ 61–62.

State that the record undermines the notion that Apodaca was ignorant about the legal system. For example, Apodaca displayed a fairly sophisticated knowledge of his rights, and he also showed that he had at least some understanding of the criminal process, as evidenced by his expressed concern that any information he divulged would be disclosed to the shooter in the police paperwork. We therefore do not have a heightened concern of suggestibility related to Apodaca's experience in the judicial system.

¶66    As for his claim that the detectives exploited his desire to avoid jail and his resolve not to talk unless he had a deal, Apodaca does not cite any authority to support his claim that those desires made him particularly susceptible to police manipulation. And Apodaca does not cite any evidence that his "'mental health, mental deficiency, [or] emotional instability' affected the voluntariness of his statements" to the detectives, and our review of the record reveals none. *See State v. Kozlov*, 2012 UT App 114, ¶ 63, 276 P.3d 1207 (alteration in original) (quoting *Rettenberger*, 1999 UT 80, ¶ 15); *see also Montero*, 2008 UT App 285, ¶ 21 ("[W]e see nothing in the record to suggest that [the defendant] was in any way particularly susceptible to coercion or manipulation."); *State v. Werner*, 2003 UT App 268, ¶¶ 18–19, 76 P.3d 204 (noting the lack of "evidence of mental illness or emotional instability that would render [the defendant] vulnerable to police interrogation," and concluding that he was not "vulnerable"). Accordingly, Apodaca's subjective characteristics do not weigh in favor of concluding that there was coercion.

¶67    Taken together, we conclude that the totality of the circumstances demonstrates that Apodaca's statements to police were voluntary. Only one factor (the *Miranda* violation) weighs in favor of determining that the interview was coercive, and the record otherwise demonstrates that Apodaca was actively and knowingly negotiating with the detectives and that his will was

not overcome by police tactics or manipulation. We thus affirm the trial court's ruling that Apodaca's statements to the detectives were not coerced and therefore could be used against him as impeachment evidence.

## II. The Aggravated Robbery Jury Instruction

¶68    Next, Apodaca contends that his aggravated robbery conviction should be reversed because of an erroneous jury instruction. According to Apodaca, the jury was required to find that he intended the robbery to occur before it could find him guilty of aggravated robbery as an accomplice, but Instruction 36 "permitted the jury to convict if it found that Apodaca acted knowingly with regard to the robbery." The State, while not directly defending the correctness of Instruction 36, responds that "Apodaca has not made the requisite showing of prejudice because the evidence, argument, and result would have been identical had the language he complained of been omitted."

¶69    Apodaca did not preserve his challenge to Instruction 36 but seeks our review under the ineffective assistance of counsel exception to the preservation rule. To prevail on a claim of ineffective assistance of counsel, a defendant must show that counsel's performance was both deficient and prejudicial. *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

A.    Deficient Performance

¶70    To show deficient performance, Apodaca must show that his defense counsel's performance "fell below an objective standard of reasonable professional judgment." *State v. Bond*, 2015 UT 88, ¶ 59, 361 P.3d 104 (quotation simplified). Apodaca argues that his defense counsel should have objected to Instruction 36 on the ground that it misstated the applicable mental state. We agree.

¶71   In a prosecution for a crime committed as an accomplice, the State is required to prove beyond a reasonable doubt that a defendant acted "with the mental state required for the commission of an offense" and "solicit[ed], request[ed], command[ed], encourage[d], or intentionally aid[ed] another person" in committing a crime. *See* Utah Code Ann. § 76-2-202 (LexisNexis 2017). "'An accomplice must . . . have the intent that the underlying offense be committed.'" *State v. Lomu*, 2014 UT App 41, ¶ 20, 321 P.3d 243 (omission in original) (quoting *State v. Briggs*, 2008 UT 75, ¶ 14, 197 P.3d 628). In other words, "accomplice liability adheres only when the accused acts with the mens rea to commit the principal offense." *State v. Calliham*, 2002 UT 86, ¶ 64, 55 P.3d 573. And "an accomplice cannot be convicted based on a lesser mental state than that required to commit the underlying [principal] offense." *State v. Grunwald*, 2018 UT App 46, ¶ 33 (citing *Calliham*, 2002 UT 86, ¶ 64), *petition for cert. filed*, June 13, 2018 (No. 20180459).

¶72   Here, aggravated robbery is the principal offense. The parties agree that, as charged in this case, the elements of aggravated robbery "require intentional conduct."[11] (Quotation simplified.)

---

11. As relevant to the charges in this case, a person commits robbery when the "person unlawfully and intentionally takes or attempts to take personal property in the possession of another from his person, or immediate presence, against his will, by means of force or fear, and with a purpose or intent to deprive the person permanently or temporarily of the personal property." Utah Code Ann. § 76-6-301(1)(a) (LexisNexis 2017). Also as relevant here, a person commits the crime of aggravated robbery when the person, in the course of committing robbery, "uses or threatens to use a dangerous weapon." *Id.* § 76-6-302(1)(a).

¶73    Instruction 36 stated that to convict Apodaca for aggravated robbery as an accomplice, the jury had to find the following elements as to Apodaca's intent for the underlying offense beyond a reasonable doubt:

> 2. The defendant Robert Apodaca,
>
> a. Intended that [Shooter] commit the crime of Aggravated Robbery; or
>
> b. *Was aware that his conduct was reasonably certain to result in* [*Shooter*] *committing the crime of Aggravated Robbery*.

(Emphasis added.) Apodaca challenges the emphasized portion of Instruction 36.

¶74    The difference between intentional conduct and knowing conduct is defined by statute. Intent is the highest level of culpability, Utah Code Ann. § 76-2-104 (LexisNexis 2017), and an actor acts "[i]ntentionally, or with intent or willfully with respect to the nature of his conduct or to a result of his conduct, when it is *his conscious objective or desire* to engage in the conduct or cause the result," *id.* § 76-2-103(1) (emphasis added). Under this mental state, which is reflected in subsection (2)(a) of Instruction 36, "the accomplice desires to cause" the principal offense. *State v. Jeffs*, 2010 UT 49, ¶ 45, 243 P.3d 1250.

¶75    On the other hand, a person acts "[k]nowingly, or with knowledge, with respect to his conduct or to circumstances surrounding his conduct when he is aware of the nature of his conduct or the existing circumstances" and "with respect to a result of his conduct when he is *aware that his conduct is reasonably certain to cause the result*." Utah Code Ann. § 76-2-103(2) (LexisNexis 2017) (emphasis added). Under this mental state, which is reflected in subsection (2)(b) of Instruction

36, "the accomplice knows that his conduct will most likely cause" the principal offense. *Jeffs*, 2010 UT 49, ¶ 45.

¶76 Instruction 36 incorrectly stated the law. The principal offense of aggravated robbery required intentional conduct, and for the jury to convict Apodaca as an accomplice, it had to find that Apodaca had the same mens rea—intentional—to commit the principal offense. Instruction 36 erroneously stated that Apodaca could be found guilty if he acted merely knowingly regarding the principal offense by giving the jury the option to find that he "was aware that his conduct was reasonably certain to result in [Shooter] committing the crime of Aggravated Robbery." This error effectively lowered the State's burden of proof. Apodaca's defense counsel should have objected to this error, and his failure to do so cannot be considered reasonable trial strategy. *See State v. Barela*, 2015 UT 22, ¶ 27, 349 P.3d 676 (holding that "no reasonable lawyer would have found an advantage in understating the mens rea requirement"). Accordingly, we conclude that Apodaca has established that his defense counsel's performance fell below an objective standard of reasonableness.

B.     Prejudice

¶77 Nevertheless, Apodaca has failed to demonstrate that his defense counsel's deficient performance prejudiced him. To show prejudice, Apodaca must demonstrate that "but for the error, there is a reasonable probability that the verdict would have been more favorable to [him]." *State v. Dunn*, 850 P.2d 1201, 1225 (Utah 1993). This requirement "is a relatively high hurdle to overcome." *State v. Garcia*, 2017 UT 53, ¶ 44. "It is not enough for [Apodaca] to show that the error[] had some conceivable effect on the outcome of the proceeding." *See Strickland v. Washington*, 466 U.S. 668, 693 (1984). Rather, "[t]he likelihood of a different result must be substantial." *Harrington v. Richter*, 562 U.S. 86, 112 (2011).

¶78    To determine whether Apodaca has met this burden, we must consider the totality of the evidence at trial, and assess "whether the jury could reasonably have found" the facts in Apodaca's favor "such that a failure to instruct the jury properly undermines confidence in the verdict." *See Garcia*, 2017 UT 53, ¶ 42. Specifically, we must ask whether there is a reasonable probability that the jury found Apodaca acted knowingly, rather than intentionally, with respect to the aggravated robbery charge. *See id.* ¶¶ 42–48 (considering whether an erroneous jury instruction caused prejudice in the context of an ineffective assistance of counsel claim).

¶79    In support of his argument that the error in Instruction 36 prejudiced him, Apodaca contends that "he did not know a robbery was going to occur," and therefore he "did not act intentionally." According to Apodaca, he "agreed to drive because he believed that they were going to do a drug deal," he was "shocked" when Shooter drew the gun and shot Victim, and he drove away "because he was afraid of [Shooter] and [Shooter] told him to drive." The evidence, however, does not support his narrative. Further, Apodaca has failed to articulate a theory of the evidence that supports his contention that it is reasonably likely that the jury found that his participation in the aggravated robbery was knowing but not intentional.

¶80    First, even if the jury believed that the robbery was unplanned, the record does not support Apodaca's claim that he was surprised by it and only participated out of fear. At trial, the jury was presented with alternative versions of events. In one version, Codefendant, Apodaca, and Shooter planned to rob Victim. Pursuant to that plan, Victim was induced into Apodaca's car with the promise of a drug transaction, and Apodaca "out of nowhere" shifted the car into gear and sped away. While Apodaca drove and ignored Victim's pleas to let him out of the car, Shooter pointed a gun at Victim's head and Shooter (and possibly Apodaca) demanded Victim turn over the

pills. Apodaca eventually stopped the car to let Victim out but only after Shooter shot Victim four times.

¶81 In the second version, as elicited from Codefendant on cross-examination,[12] Codefendant arranged a drug deal with Victim and never intended to rob him. The anticipated transaction turned into a robbery when Shooter pulled out a gun and demanded Victim's pills. But this is where the divergence between the two versions ends. Although Apodaca asserts there is evidentiary support for defense counsel's opening statements that Apodaca "was shocked when [Shooter] pulled out the gun" and that he "drove away because he was afraid of [Shooter] and [Shooter] told him to drive," no evidence supports that assertion.

¶82 Instead, Codefendant testified that he did not hear Shooter order Apodaca to drive, and neither Codefendant nor Victim described Apodaca as a fearful (or even passive) participant. While both witnesses equivocated about whether it was Shooter or Apodaca who demanded the pills and suggested that Victim be shot, both witnesses described Apodaca as actively involved. It was Apodaca, after all, who shifted the car into gear and sped away while Victim was still counting the pills in the backseat, and it was Apodaca who did not unlock the

---

12. Although Codefendant testified on direct examination that he, Apodaca, and Shooter made a plan to rob Victim, the jury also heard that Codefendant previously stated that he had only arranged a drug deal with Victim and did not know there would be a robbery. This version of events was based on Codefendant's statement of facts in support of his plea agreement: "On or about November 28, 2012, I arranged for two people to obtain . . . Oxycontin from another individual. During the drug transaction, one of the two people pulled out a handgun and demanded Oxycontin from the victim. I should have known that the other two individuals were going to try to take the drugs by force."

doors or stop the car in response to Victim's multiple pleas. And Apodaca drove the car away after Codefendant and Victim exited it. Further, when defense counsel tried to elicit testimony from Apodaca's girlfriend and Codefendant that Shooter was someone to be afraid of, both witnesses rejected the suggestion.

¶83    Thus, Apodaca's contention that he was an unwilling participant in the aggravated robbery—a contention on which his claim of prejudice depends—fails because it lacks evidentiary support. *See generally State v. Jimenez*, 2012 UT 41, ¶ 14 & n.22, 284 P.3d 640 (concluding that, regardless of whether the defendant knew beforehand that the codefendant had a gun, the defendant knew a gun was used in the robbery and became an accomplice to the aggravated robbery by driving the getaway car, and collecting cases acknowledging that "drivers of getaway cars are typically found guilty under accomplice liability theories because, as a driver, they inherently show active involvement in the crime" (quotation simplified)); *State v. Garcia-Vargas*, 2012 UT App 270, ¶ 17, 287 P.3d 474 (stating that once a codefendant started hitting a victim and ransacking a house, the defendant was "on notice that [the codefendant] was committing a robbery," and concluding that, by "actively participat[ing]," it was fair to infer that the defendant intended to aid the codefendant in robbing the victims absent any assertion that he had another mental state).

¶84    Second, Apodaca's claim of prejudice fails for the additional reason that he has not explained how, even if the jury accepted his version of events,[13] it reasonably could have concluded that he acted knowingly, in that he "was aware that

---

13. Apodaca contends that the jury's question about the legal relevance of duress and its acquittal of him on the discharge of a firearm charges suggest that "it was inclined to believe that Apodaca was a less-than-willing, if not unwilling, participant."

his conduct was reasonably certain to result in [Shooter] committing the crime of Aggravated Robbery," but not intentionally. While the Utah Supreme Court has recognized that "there exists a narrow set of circumstances where a person may act 'knowingly' without acting 'intentionally,'" it has also observed that the "terms are not . . . mutually exclusive, and most 'knowing' conduct also fits accurately within the statutory definition of 'intentional' conduct." *State v. Casey*, 2003 UT 55, ¶ 47, 82 P.3d 1106. Other than merely suggesting that it is reasonably likely that the jury would have acquitted him of aggravated robbery if it believed he did not originally plan to rob Victim, Apodaca has not articulated how the jury reasonably could have concluded that he acted knowingly without also concluding that he acted intentionally. He has therefore failed to demonstrate prejudice resulting from his counsel's performance, *see State v. Garcia*, 2017 UT 53, ¶ 37 ("[I]t is the defendant's burden to show that he was prejudiced by his counsel's performance."), and his ineffective assistance of counsel claim necessarily fails, *see Strickland v. Washington*, 466 U.S. 668, 687 (1984) (explaining that to succeed on a claim of ineffective assistance of counsel a defendant must show that counsel's performance was both deficient and prejudicial).[14]

---

14. Apodaca also asks this court to review his unpreserved challenge to Instruction 36 under the rubrics of plain error and manifest injustice. "When a party fails to object to a jury instruction in the trial court, 'the instruction may not be assigned as error except to avoid a manifest injustice,' and in most circumstances manifest injustice is synonymous with plain error." *State v. Reigelsperger*, 2017 UT App 101, ¶ 39, 400 P.3d 1127 (quoting Utah R. Crim. P. 19(e)). To succeed on a claim of plain error, a defendant "must establish harmful error that should have been obvious to the trial court." *Id.* (citing *State v. Holgate*, 2000 UT 74, ¶ 13, 10 P.3d 346). The harmfulness test in

(continued…)

CONCLUSION

¶85    The trial court correctly ruled that Apodaca's statements to the detectives were voluntary and that the State therefore could introduce those statements at trial to impeach Apodaca if he chose to testify. As to his conviction for aggravated robbery, Apodaca has not shown that he was prejudiced by the error in the jury instruction explaining the elements of that offense. Accordingly, we affirm each of Apodaca's convictions.

_____

(…continued)
the context of the plain error analysis "is equivalent to the prejudice test applied in assessing claims of ineffective assistance of counsel." *State v. Dean*, 2004 UT 63, ¶ 22, 95 P.3d 276. Because we have concluded that Apodaca's ineffective assistance of counsel claim fails for lack of prejudice, his plain error claim likewise fails.